**CARLISLE TIRE & RUBBER CO., DIVISION OF CARLISLE CORP. et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

**Dong-Ah Tire Ind. Co., Ltd., Heung-Ah Tire Ind. Co., Ltd., Defendants-Intervenors.**

**Court No. 84–7–01058.**

United States Court of International Trade.

Oct. 24, 1985.

that the decision to deny plaintiff benefits was not factually justifiable, I need not reach this issue.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson and J. Eric Nissley), Washington, D.C., for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Dir., Dept. of Justice, Commercial Litigation Branch (Shelia N. Ziff), Washington, D.C., for defendant.

Dow, Lohnes & Albertson (William Silverman, John C. Jost, and Margaret B. Dardess), Washington, D.C., for defendant-intervenor Dong-Ah Tire Ind. Co., Inc.

Arnold & Porter (Richard A. Johnson and Stephan E. Becker), Washington, D.C., for defendant-intervenor Heung-Ah Tire Ind. Co., Inc.

*Memorandum Opinion and Order*

DiCARLO, Judge:

Plaintiffs, domestic producers of tire tubes, challenge a final determination by the United States Department of Commerce, International Trade Administration (Commerce) that tubes for tires, other than bicycle tires, (inner tubes) from Korea are not being sold in the United States at less than fair value. *Tubes For Tires, Other Than Bicycle Tires, From the Republic of Korea* (Final), Antidumping Investigation No. A–580–009, 49 Fed.Reg. 26,780 (1984).

## I. BACKGROUND

In July, 1983 seven domestic producers (petitioners) petitioned Commerce on behalf of the domestic inner tube industry alleging that inner tubes from Korea were, or were likely to be, sold in the United States at less than fair value, that these imports were materially injuring, or threatening to injure, an industry in the United States, and that an antidumping duty should be imposed under 19 U.S.C. § 1673 (1982).

Commerce published notice of its determination to begin an investigation on Au-

gust 12, 1983. 48 Fed.Reg. 36,637 (1983). The International Trade Commission found reasonable indication that imports of inner tubes were materially injuring, or threatening to materially injure, a United States industry. *Tubes for Tires, Other Than For Bicycle Tires, From The Republic of Korea,* Investigation No. 731–TA–137 (Preliminary), USITC Public. No. 1416, 48 Fed. Reg. 39,519 (1983).

Commerce sent sales price and production cost questionnaires to two Korean producers, Heung-Ah Tire Ind. Co., Ltd. (Heung-Ah) and Dong Ah Tire Ind. Co., Ltd. (Dong-Ah), who together produce about 90 percent of the inner tubes exported from Korea to the United States. On February 10, 1984, Commerce published a preliminary determination that the Korean producers were not selling at less than fair value. 49 Fed.Reg. 5155.[1]

Commerce published its final negative determination on June 29, 1984, finding *de minimus* weighted-average dumping margins of 0.03% for Heung-Ah and 0.01% for Dong-Ah. 49 Fed.Reg. 26,780, 26,784.

On July 25, 1984, six of the petitioners (plaintiffs) sought review of Commerce's determination, pursuant to 19 U.S.C. § 1516a(a)(2) (1982). On October 31, 1984, the administrative record was filed in the Court. Dong-Ah and Heung-Ah were granted leave to intervene on November 14, 1984 and December 27, 1984, respectively.

On January 9, 1985, plaintiffs moved to compel the filing of a newly certified and supplemented administrative record. Following a hearing held on February 25, 1985, plaintiffs' motion was granted in part and denied in part.[2] A newly certified record was filed in the Court on May 17, 1985. Plaintiffs now move for judgment on the agency record pursuant to Rule 56.1 of the Rules of this Court.

Plaintiffs claim Commerce made several errors in determining and adjusting the foreign market value of intervenors' inner tubes. Foreign market value is defined at 19 U.S.C. § 1677b(a)(1) (1982). Our appellate court has summarized the central role of foreign market value in the antidumping laws:

if foreign merchandise is sold or is likely to be sold in the United States at less than its *fair value* to the material injury of a United States industry, then an additional antidumping duty shall be imposed. The amount of the duty shall equal the amount by which the *foreign market value* exceeds the *United States price* for the merchandise.

Foreign market value and United States price represent prices in different markets affected by a variety of differences in the chain of commerce by which the merchandise reached the export or domestic market. Both values are subject to adjustment in an attempt to reconstruct the price at a specific, "common" point in the chain of commerce, so that value can be fairly compared on an equivalent basis.

*Smith-Corona Group v. United States,* 713 F.2d 1568, 1571–72 (Fed.Cir.1983) (emphasis in original) (footnote omitted), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). The foreign market value of intervenors' inner tubes was determined on the basis of home market sales, in accordance with 19 U.S.C. § 1677b(a)(1).

Specifically, plaintiffs claim that:

(1) Commerce incorrectly paired the sizes of inner tubes Heung-Ah sold in the home market and in the United States as "such or similar merchandise";

(2) Commerce should have allocated all or part of Dong-Ah's labor cost at the rubber mixing stage of production on the basis of tube weights, rather than time, in determining Dong-Ah's cost of production for disregarding below cost of production home market sales;

---

**1.** Pursuant to requests from petitioners, and 19 U.S.C. §§ 1673b(c), 1673d(a)(2) (1982), Commerce postponed its preliminary and final determinations. 48 Fed.Reg. 53,740 (1983); 49 Fed.Reg. 12,733 (1984).

**2.** The Court denied plaintiffs' motion to have certain telexes included in the record. *See* note 20, *infra.*

(3) Commerce should have used a six-month weighted average rather than quarterly data in determining Dong-Ah's cost of manufacture for making merchandise adjustments to Dong-Ah's foreign market value;

(4) Commerce should have made a circumstances of sale adjustment to Heung-Ah's foreign market value to include product liability insurance expenses for exported tubes;

(5) Commerce should have made a level of trade adjustment to Heung-Ah's foreign market value to include unloading charges in sales to original equipment manufacturers;

(6) Commerce insufficiently investigated respondent's home market sales prices; and

(7) in adjusting foreign market value to account for differences in physical characteristics of the exported and home market inner tubes, Commerce improperly determined and insufficiently verified the weights of intervenors' exported inner tubes.[3]

The Court finds, with respect to each contention except verification of the weights of Dong-Ah's exported inner tubes, that Commerce's determination is supported by substantial evidence or otherwise in accordance with law.

## II. THE STANDARD FOR JUDICIAL REVIEW

Judicial review of final determinations in antidumping investigations is provided under 19 U.S.C. § 1516a(b)(1)(B) (1982), which states: "The court shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), quoted in *Matsushita Electric Industrial Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984). It is "enough [evidence] to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury," *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939), and "something less than the weight of the evidence ... [T]he possiblity of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence," *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *Matsushita Electric Industrial Co. Ltd. v. United States*, 750 F.2d 927, 936 (Fed.Cir.1984) (substantial evidence a "limited standard of review" ).

■ The substantial evidence standard "frees the reviewing courts of the time-con-

---

**3.** Plaintiffs also argue in their initial brief that Commerce failed to disregard all below cost home market sales by Dong-Ah in adjusting its foreign market value, and that Commerce made numerous errors entering data in the computer programs used to compute foreign market value.

Plaintiffs' reply brief concedes that Commerce disregarded Dong-Ah's below cost home market sales in the recalculations performed in the corrected computer runs appended to *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Administrative Record* as Appendix II. *Plaintiffs' Brief in Reply* at 10 n. 6.

Defendant says that Commerce reviewed all plaintiffs' data entry error allegations and have "corrected every entry where in fact error was made." *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Administrative Record* at 3. Defendant states that these corrections resulted in only infinitesimal differences and that *de minimus* margins continue to exist. Plaintiffs contend that Commerce's correction of data entry errors are incomplete but admit that "their accurate correction would not, taken in isolation, materially alter the 'corrected' printouts' results...." *Plaintiffs' Brief in Reply* at 4 n. 2. In a telephone conference plaintiffs conceded that the Court need not remand the determination solely to correct data entry errors.

suming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131 (1966) (footnote omitted). But the Court must consider the record as a whole; evidence on the record which detracts from the substantiality of the evidence relied on by the agency in making its determination must be considered. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir.1984).

With respect to the administration and enforcement of the antidumping laws, our appellate court has said:

> The Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, establishes an intricate framework for the imposition of antidumping duties in appropriate circumstances. The number of factors involved, complicated by the difficulty in quantification of these factors and the foreign policy repercussions of a dumping determination, makes the enforcement of the antidumping law a difficult and supremely delicate endeavor. The Secretary of Commerce (Secretary) has been entrusted with responsibility for implementing the antidumping law. The Secretary has broad discretion in executing the law.

*Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed.Cir.1983) (footnotes omitted). "Our review of the statute reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." *Id.*, at

1582; *see Consumer Products Division, SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1039–40 (Fed.Cir.1985).

The legislative history of the Trade Agreements Act of 1979 discloses that Congress intended to give Commerce "greater flexibility" in conducting antidumping investigations.[4] *See Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 930–31 (1984). This flexibility was accompanied by statutory deadlines which require Commerce to complete these investigations promptly.[5]

The appellate court has not hesitated to reverse this Court when insufficient deference was given to the agency.[6]

■ To summarize, the substantial evidence on the record test permits only a limited review of the agency determination; our appellate court has found that Congress requires the Court to give Commerce's determination of foreign market value "tremendous deference." Under present law it is not for the Court to impose its preferred choices on Commerce with respect to the sufficiency of its investigation or the wisdom of its methods so long as there is support in the record as a whole for its determination and its methods are in accordance with law.

With these considerations in mind, the Court now considers plaintiffs' challenges to Commerce's determination. Most of plaintiffs' arguments challenge methods used by Commerce in determining and adjusting foreign market value. The final two arguments—that Commerce erred in determining home market prices and the rubber weight of exported inner tubes—

---

**4.** The House Report on the Trade Agreements Act states:

> The [Act] retains the concept of 'fair value' for purposes of the investigative phase of an antidumping proceeding. The term fair value is not defined in current law nor in the bill. The Committee intends the concept to be applied essentially as an estimate of 'foreign market value' during the period of investigation so as to provide the Authority with greater flexibility in administration of the law.

H.Rep. No. 96–317, 96th Cong., 1st Sess. 59 (1979).

**5.** "[A] major objective" of the 1979 Trade Act was to reduce the length of antidumping investigations. S.Rep. No. 249, 96th Cong., 1st Sess. at 75, *reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 461.

**6.** *See, e.g., Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033 (Fed. Cir.1985); *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed.Cir.1984); *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed.Cir. 1984).

challenge the sufficiency of the evidence Commerce relied on making its determination.

### III. COMMERCE'S METHODS IN CALCULATING FOREIGN MARKET VALUE

#### A. Such or Similar Merchandise

To determine foreign market value, Commerce is required to determine, for merchandise exported to the United States, the price charged for "such or similar merchandise" in the home market. 19 U.S.C. § 1677b(a)(1)(A) (1982). In its investigation, Commerce compared home market inner tubes and inner tubes exported to the United States on the basis of product category and weight.

Plaintiffs claim that the weights of the tubes should be the only basis of comparison. They point to a memorandum written by Commerce investigators advising that Commerce should compare the tubes solely on that basis.[7]

Commerce's determination and the supplemental corrected computer runs[8] indicate the method chosen by Commerce to compare the home market tubes and tubes exported to the United States. In comparing tube models within the same product category, Commerce compared merchandise which is "like ... in the purposes for which [it is] used," according to 19 U.S.C. § 1677(16)(C)(ii) (1982). For example, tubes for passenger cars were compared only with tubes for other passenger cars and not with tubes for trucks or farm vehicles.

As this Court recently held, failure to use a discretionary alternative method does not constitute error when the agency uses a lawful second method. *Zenith Corp. v. United States*, 9 CIT ——, ——, 606 F.Supp. 695, 698 (1985), *appeals docketed*, No. 85–2246, (Fed.Cir. April 10, 1985), No. 85–2286 (Fed.Cir. April 26, 1985).[9] The Court holds that Commerce's determination to compare inner tubes according to product category was reasonable and in accordance with law.

#### B. Dong-Ah's Allocation of Labor Costs

Home market sales at less than cost of production must be disregarded in determining foreign market value. 19 U.S.C. § 1677b(b) (1982). Cost of production is the cost of making and selling the merchandise. *See* 19 C.F.R. § 353.7(b) (1984). In determining Dong-Ah's cost of production, Commerce accepted Dong-Ah's time-based allocation of labor costs for the rubber mixing stage of production.

Plaintiffs argue that the labor costs at the mixing stage should be allocated according to the weight of the finished tubes, rather than by the employee time expended mixing the rubber. Plaintiffs claim that Dong-Ah began to allocate its labor costs at the rubber mixing stage according to time in December, 1983, after plaintiffs argued to Commerce that Dong-Ah's cost of production exceeded its sales prices for larger tube sizes. Plaintiffs say that prior to that time Dong-Ah allocated the rubber mixing stage cost according to weight, and by shifting its allocation basis Dong-Ah moved labor costs away from larger tubes and towards smaller ones.

Commerce determined that either weight or time is acceptable as a basis for allocating labor costs at the mixing stage. Commerce explained that Dong-Ah's records are maintained on a time basis, and that there was no justification for changing

---

**7.** Plaintiffs do not argue that this memorandum is evidence of agency "precedent" which Commerce was "obligated to follow." *Cf. M.M. & P. Maritime Advancement, Training and Safety Program v. Department of Commerce,* 729 F.2d 748 (Fed.Cir.1984).

**8.** *See* note 3, *supra.*

**9.** In that case, plaintiffs contended that Commerce should have determined foreign market value on the basis of home market prices evidenced by price information submitted by the Japanese respondent to the Japanese Government for payment of the Japanese Commodity Tax. Instead, Commerce based foreign market value on constructed value. *See* 19 U.S.C. §§ 1677b(a)(2), 1677b(e).

The Court concluded that "although the use of the commodity tax information would have been lawful and had much to recommend it, [Commerce] was under no statutory obligation to use it." 606 F.Supp. at 698.

Dong-Ah's allocation method since "any such adjustments would have an immaterial effect on the total cost of production." 49 Fed.Reg. at 26,783. Plaintiffs' arguments were considered by a Commerce accountant who determined that Dong-Ah's time-based allocation was reasonable. Heung-Ah allocates its labor costs at the mixing stage by time, as does plaintiff Carlisle Tire & Rubber Company.

Again, the Court must defer to Commerce's expertise and judgment. The Court holds that Commerce's acceptance of Dong-Ah's time-based labor cost allocation was reasonable and in accordance with law.

### C. Calculation of Dong-Ah's Cost of Manufacture

Adjustments must be made in foreign market value to the extent that physical differences in the home market and export merchandise being compared result in differences in cost of production of the merchandise. 19 U.S.C. § 1677b(a)(4) (1982), 19 C.F.R. § 353.16 (1984). Intervenors' inner tubes manufactured for export to the United States have more rubber content than tubes sold in the home market. In order to adjust foreign market value to account for this physical difference in home market and exported tubes, Commerce calculated the cost of manufacturing, or making, the tubes. To determine the cost of manufacture, Commerce used costs in the quarter in which the sale occurred, rather than six-month weighted average costs, which were used to calculate cost of production in order to disregard below cost of production home market sales in determining foreign market value.

Plaintiffs argue that since Commerce determined Dong-Ah's cost of production by six-month weighted average, it was required to use six-month weighted average to determine cost of manufacture, which is an element of cost of production. Plain-

tiffs say that Commerce could not reasonably use a six-month weighted average to calculate the entire cost of production for one purpose and another method to calculate part of that cost for another purpose.

The Court disagrees. Defendant says Commerce used quarterly data in calculating the cost of manufacture because it believed that method would reflect those particular costs more accurately than would a six-month weighted average. Plaintiff does not dispute this. Commerce's determination that quarterly data are more accurate for making merchandise adjustments is entitled to deference, and the Court finds it reasonable and in accordance with law.

### D. Circumstances of Sale Adjustments

#### 1. Product Liability Insurance

19 U.S.C. § 1677b(a)(4) provides that "if it is established to the satisfaction of [Commerce] that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to ... differences in the circumstances of sale ... then due allowance shall be made therefor." Differences in circumstances of sale generally will be limited "to those circumstances which bear a direct relationship to the sales which are under consideration." 19 C.F.R. § 353.15(a) (1984).

Plaintiffs assert that the cost of Heung-Ah's product liability insurance for foreign sales is a difference in circumstances of sale between the United States and home market that Commerce was required to consider in adjusting Heung-Ah's foreign market value. Plaintiffs say the cost of product liability insurance is an "assumption by a seller of a purchaser's ... other selling costs" within the scope of 19 C.F.R. § 353.15(b).[10] Plaintiffs argue that since the cost of product liability insurance is

---

**10.** 19 C.F.R. 353.15(b) provides in part:

Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or

other selling costs. Reasonable allowances also generally will be made for differences in commissions. Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a later sale of the merchandise by a purchaser.

incurred only for export sales, and not for sales in Korea, it is a selling expense directly related to export sales.

Commerce's notice of its determination states:

> In our preliminary determination, we also made adjustments to both Heung-Ah's and Dong-Ah's home market prices for costs relating to product liability insurance. Further analysis reveals that these costs are general in nature and not directly related to specific sales. Therefore, we have not made the adjustments for the final determination.

49 Fed.Reg. at 26,781.[11]

Congress has given Commerce broad discretion to determine whether a factor or condition of sale warrants an adjustment in foreign market value for circumstances of sale. In *Brother Industries Ltd. v. United States*, 3 CIT 125, 540 F.Supp. 1341 (1982), this Court held that

> it must be stressed that the statute requires only that a causal link be established to the *satisfaction of the administering authority....* Manifestly, then, since the statute sets forth no definitive criterion, Congress intended to rely upon the expertise and judgment of the administering authority to determine the criterion which will establish the existence of the necessary causal link between the difference in prices and differences in circumstances of sale.

3 CIT at 130, 540 F.Supp. at 1349 (emphasis in original). *See Smith-Corona Group v. United States*, 713 F.2d 1568, 1580 (Fed. Cir.1983).

Commerce found that Heung-Ah's product liability costs covered all products sold by that firm world wide, and did not relate just to specific sales of inner tubes in the United States. Commerce's decision not to make a circumstance of sale adjustment for the cost of product liability insurance is reasonable and in accordance with law.

### 2. Level of Trade Adjustment for Sales to Original Equipment Manufacturers

■ 19 C.F.R. § 353.19 (1984) requires Commerce to disregard home market sales to different levels of trade than United States sales or make "appropriate adjustments ... for differences affecting price comparability."[12] Such adjustments may be required where purchasers perform different functions in the distribution network which result in different costs.[13] A level of trade adjustment is appropriate where, for example, sales are made in one market to wholesalers who do their own warehousing, invoicing and marketing and in the other market to retailers who do not.

Plaintiffs claim that Commerce erred in failing to adjust Heung-Ah's foreign market value for home market sales to two "original equipment manufacturers" that resell the tubes with automobiles. Plaintiffs allege that sales to original equipment manufacturers in Korea are sales at a different level of trade, and that the unloading charge absorbed by Heung-Ah in such sales should be added to the sale price as a difference in the circumstances of sale under 19 U.S.C. § 1677b(a)(4)(B) (1982).[14]

---

**11.** Commerce did refuse to make a circumstances of sale adjustment requested by Heung-Ah for its sales promotional expenses incurred in Korea. Commerce concluded there was not "sufficient information relating these expenses to sales of the products under investigation." 49 Fed.Reg. at 26,781.

**12.** 19 C.F.R. § 353.19 provides:
The comparison of the United States price with the applicable price in the market of the country of exportation (or, as the case may be, the price to or in third country markets) generally will be made at the same commercial level of trade. However, if it is found that the sales of merchandise to the United States or in the applicable foreign market to

the same commercial level of trade are insufficient in number to permit an adequate comparison, the comparison will be made to the nearest comparable commercial level of trade and appropriate adjustments will be made for differences affecting price comparability.

**13.** *See e.g. Portland Hydraulic Cement from Australia*, 48 Fed.Reg. 41,056, 41,057–58 (1983).

**14.** Heung-Ah asserts, without record citation, that the unloading expenses for these two customers was a price concession of only 2.33 to 4.67 won (less than one cent) per tube. *Brief of Intervenor Heung-Ah* at 18, n. 8.

In the Federal Register notice announcing its determination, Commerce stated that:

> We have examined Heung-Ah's home market sales and have found (1) no correlation between price and class of customer, (2) no evidence indicating that pricing differentials are due to differences in selling costs at different levels of trade, and (3) no significant differences in quantities sold between "OEM's" [sic] [original equipment manufacturers] in the home market and "wholesalers" in the U.S. market. Our verification indicates that Heung-Ah's prices to each of its home market customers were established through negotiation with the customer. Rebates and the payment of unloading charges are not provided to every OEM customer, but only to the one that happens to be Heung-Ah's largest customer. Petitioners argument is inconsistent. While they would have us exclude sales to OEM customers, they do not argue that we should exclude sales to Heung-Ah's other customers that are not called wholesalers. Therefore, we have determined that a level of trade adjustment is not warranted, and we have based the weighted-average home market prices on sales to all classes of customers, including OEM's.

49 Fed.Reg. at 26,781–82.

Both the quantities of inner tubes sold to original equipment manufacturers and the prices charged such customers were considered by Commerce in its investigation. *Cf. Silver Reed America, Inc. v. United States*, 7 CIT —, —, 581 F.Supp. 1290, 1295–96 (1984), *rev'd on other grounds sub nom. Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033 (Fed.Cir.1985) (level of trade is-

sue remanded since Commerce compared only quantities sold, not prices). Plaintiffs do not dispute Commerce's factual findings, but argue that Commerce erred in not finding that the facts warranted a level of trade adjustment.[15]

■ As noted previously, 19 U.S.C. § 1677b(a)(4)(B) grants Commerce broad discretion in determining whether a circumstances of sale warrants an adjustment in foreign market value. *Brother Industries, Ltd. v. United States*, 3 CIT 125, 540 F.Supp. 1341 (1982).

The Court holds that Commerce's finding that Heung-Ah's sales to original equipment manufacturers were not at a sufficiently different level of trade to require that the unloading charge absorbed by Heung-Ah in such sales should be added to the sale price as a circumstance of sale adjustment is reasonable and in accordance with law.

## IV. THE ADEQUACY OF COMMERCE'S INVESTIGATION

### A. Intervenors' Home Market Sales Prices

Plaintiffs argue that Commerce's findings of home market prices are not supported by substantial evidence because Commerce insufficiently investigated home market prices in view of information submitted by plaintiffs that intervenors understated those prices. Plaintiffs submitted alleged price lists of Heung-Ah and two price surveys indicating lower home market prices than those claimed by intervenors and found by Commerce.[16]

In its final determination, Commerce stated that no further investigation of the intervenors' Korean sales prices was war-

---

**15.** Commerce has previously said that a negotiated price concession to some purchasers does not establish that those purchasers occupy a different level of trade under § 353.19. *See Steel Wire Rope From the Republic of Korea,* 48 Fed.Reg. 41,615, 41,617 (1983).

**16.** Plaintiffs' first study, submitted with their petition, alleged prices considerably lower than the prices reported by intervenors in their re-

sponses to Commerce's questionnaires. Plaintiffs gave Commerce a Korean price list for Heung-Ah tubes that showed higher prices than Heung-Ah reported to Commerce.

Plaintiffs' second study of intervenors' home market prices, which also alleged lower prices than those reported by intervenors, was submitted to Commerce in May, 1984, less than two months prior to the final determination.

ranted because (1) Commerce verified the prices claimed by intervenors and was satisfied that they were accurate; (2) Commerce did not find "any evidence of concealment" by the intervenors; and (3) petitioners did not submit "any documentation (*e.g.,* sales invoices, customer receipts, payment records, etc.)" to support their allegations that the claimed prices were inaccurate. 49 Fed.Reg. at 26,783.

Three Commerce investigators visited the premises of both intervenors in Korea in January, 1984, to verify intervenors' responses to Commerce's sales price questionnaires. For Dong-Ah, Commerce investigators examined internal sales documents, customer slips, journal entries and records of payment for randomly selected sales. For Heung-Ah, Commerce investigators examined, also at random, ledgers, invoices, contracts, and letters of credit. From these documents, Commerce verified inland freight expenses, sales commissions, warranty expenses, packing costs, difference in payment terms, customs duty drawback, direct selling price adjustments, promotional expenses, and product liability insurance for both intervenors. Commerce investigators found no discrepancies between intervenors' questionnaire responses and the verified home market prices.

In March, 1984, a fourth Commerce investigator met in Korea with a representative of an accounting firm that assisted in plaintiffs' first study of home market prices. The investigator was told that: the study of the Korean inner tube industry was conducted "a couple of years" prior to 1984;[17] the primary source of information consisted of interviews with customers, retailers, or wholesalers, sometimes by researchers posed as college students to encourage corporate officials (a company comptroller, for example) to be more frank; the only documentation obtained was a "price list" covering a period ending in 1982; the information obtained had been inconsistent; those interviewed were not knowledgeable and sometimes mistaken about the merchandise; and the estimated break-even prices on sales of the Korean producers were performed by extrapolation based on the public financial statements of each producer, data obtained through interviews, and "guess work."[18]

The investigator also interviewed a representative of the Korea Price Association (Association) to probe allegations in plaintiffs' first study regarding the Association's findings of home market prices. The Association official stated that his organization's information represented prices from distributors to retailers, and from retailers to consumers, and that the Association did not collect data concerning manufacturers' prices. Since manufacturers' prices were at issue in the investigation, the prices found by the Association were irrelevant.[19]

**17.** Commerce investigated sales for the period February 1, 1983 to July 31, 1983.

**18.** Plaintiffs argue that the investigator's memoranda did not provide an accurate summary of the statements made to him by the Korean accountant and ask the Court to consider two telexes not in the record. On March 29, 1985, the Court issued a memorandum opinion and order denying plaintiffs' motion to compel Commerce to include these documents. The Court held that the documents were not "presented to or obtained by" Commerce in accordance with its regulations, and thus were not part of the "record" as defined by 28 U.S.C. § 2635(b)(1)(A) and 19 U.S.C. § 1516a(b)(2)(A)(i) (1982).

Plaintiffs say the Court may consider the telexes in order to clarify any ambiguity in the record. *See Bunker Hill Co. v. EPA,* 572 F.2d 1286, 1292 (9th Cir.1977). Plaintiffs claim that the two telexes suggest that the investigator experienced difficulty in understanding the Korean accountant's explanation as to how, when, and from whom the Heung-Ah price list had been obtained, as well as what the price list signified.

Assuming, *arguendo,* that the Court could consider the telexes, the Court does not find that they change the result. There is substantial evidence on the record as a whole that Commerce verified intervenors' home market prices.

**19.** Plaintiffs claim that the record shows that Association reports wholesale prices as well as retail prices. Again, even if the investigator erred in reporting this conclusion, the on-site verification provides substantial evidence for Commerce's determination of intervenor's home market prices.

Based upon these interviews, Commerce decided not to investigate further the information contained in plaintiffs' first price study.

Plaintiffs submitted to Commerce a second set of home market price allegations less than two months before the final determination.[20] Commerce had investigated and satisfied itself that there was no basis for home market prices claimed in plaintiffs' first study and had completed its verification of intervenors' prices using standard verification techniques. It was not unreasonable for Commerce to decline to undertake another on-site verification after receiving plaintiffs further allegations.[21]

The Court finds that there is substantial evidence in the record as a whole to support Commerce's determination of the prices charged by intervenors in the home market.

### B. Weights of Exported Tubes

Finally, plaintiffs allege that Commerce improperly determined and insufficiently verified the weights of intervenors' tubes exported to the United States.[22] They say that the weights of exported tubes indicated by shipping documents and price lists included with intervenors' questionnaire responses are significantly higher than the weights reported to Commerce. Plaintiffs also contend that nothing in the record indicates that Commerce verified the weights of Dong-Ah's tubes.

With respect to their first contention, plaintiffs say that the packing documents and price lists are particularly credible since they predate the antidumping investigation and were circulated in the normal course of business. Plaintiffs say that a price list for Dong-Ah export tubes, which includes a declared federal excise tax,[23] is especially probative because the cost of importing Dong-Ah tubes into the United States would be increased if the tube weights were overstated. Plaintiffs argue that the price list is analogous to a statement against interest under Fed.R.Evid. 804(b)(3).[24]

In its final determination notice, Commerce stated that: (1) intervenors deny that the price lists are authentic; (2) the price lists may have indicated the weight of the tubes with valves, while intervenors reported the weight of the tubes without valves; (3) federal excise tax information on the Dong-Ah price list may have been calculated on the basis of average weights as opposed to actual weights;[25] and (4)

---

**20.** This submission, which consists of tables of prices said to have been obtained by Korean researchers, was not accompanied by invoices or other documentation, nor does it record dates of purchase, quantities purchased, or other information relating to individual transactions.

**21.** The Court notes that 19 U.S.C. § 1677e(b) permits Commerce to use the best information available if a party does not produce information in a "timely manner."

**22.** The weight of the exported tubes is important because foreign market value adjustment for differences in the home market and export tubes other than valve differences is largely determined by the weight of the tubes which are being compared. The cost of manufacture for the exported tube will exceed the cost of manufacture of the home market comparison tube, and the foreign market value of the home market tube will be adjusted upward, to the extent that the exported tube weighs more—has more rubber material—than the home market comparison tube. *See* 19 C.F.R. § 353.16 (adjustment amount primarily determined by differ-

ence in cost of producing physical differences in merchandise); Part III.C. *supra*.

**23.** This tax is based on the weight of the merchandise. *See* section 4071(a)(3) of the Internal Revenue Code of 1954, as amended (section repealed, effective January 1, 1984).

**24.** Plaintiffs say that it was against the pecuniary interest of the price list's author (the "declarant") to circulate a list of substantially higher taxes payable by purchasers than were actually required by the tube weights; that such a statement against interest is admissible as evidence of the truth of the statement; and that there is no requirement that the declarant be the party, or the agent of the party, against which the statement is submitted.

**25.** Dong-Ah informed Commerce that the weights reported for purposes of the federal excise tax include valve weights pursuant to 26 C.F.R. § 48.4071–2(a)(2) (1984). Internal Revenue Service regulations also permit reporting of inner tube weights on the basis of an average weight for each size. 26 C.F.R. § 48.4071–2(b) (1984).

random weighing of intervenors' tubes was conducted at verification, and "[n]o significant discrepancies were found." 49 Fed. Reg. at 26,783.

■ In determining the weights of the exported tubes, Commerce rejected information contained in shipping documents and price lists, preferring to weigh sample tubes. It is within the discretion of Commerce to determine how to verify the weights, and due deference will be given to the expertise of the agency. *See Zenith Corp. v. United States*, 9 CIT ——, ——, 606 F.Supp. 695, 698 (1985), *appeals docketed*, No. 85–2246, (Fed.Cir. April 10, 1985), No. 85–2286 (Fed.Cir. April 26, 1985) ("Substantial evidence does not have to be perfect evidence. [Commerce] is even empowered to utilize information which might be less than satisfactory in normal situations").

However, while the verification report for Heung-Ah indicates that sample tubes of eight sizes were weighed at Heung-Ah's factory, the verification report for Dong-Ah does not mention a weighing of Dong-Ah's tubes, nor any other verification of the weight data reported to Commerce by Dong-Ah. Congress requires Commerce to "verify all information relied upon in making a final determination in an investigation" and to "report the method and procedures used to verify such information." 19 U.S.C. § 1677e(a) (1982).

It is not clear whether weight information was omitted from the Dong-Ah verification report by inadvertence, or whether the investigators did not weigh Dong-Ah's tubes. In any event, the finding in the notice of the final determination regarding the accuracy of the tube weights reported by Dong-Ah is unsupported by the Dong-Ah verification report.

Defendant argues that the record contains evidence that Dong-Ah's tube weights were verified on the basis of a letter written to Commerce by an attorney for Dong-Ah.[26] The letter, which is part of the record, states: "At the verification in Pusan, Commerce investigators selected tube sizes at random and weighed the tubes in order to verify the reported weight.... By actually weighing the tubes, the investigators determined the accuracy of the weights reported by Dong-Ah...."

This statement, made by an attorney for an interested party after the conclusion of the verification proceedings, possesses none of the indicia of reliability commonly considered in determining probative value. *Cf. Richardson v. Perales*, 402 U.S. 389, 402–06, 91 S.Ct. 1420, 1427–30, 28 L.Ed.2d 842 (1971); *Calhoun v. Bailar*, 626 F.2d 145, 148–49 (9th Cir.1980); *James C. Goff Co. v. United States*, 58 CCPA 147, 149, 441 F.2d 671, 763 (1971). That Commerce investigators could have included in their verification report a description of actual weighing of the Dong-Ah tubes, if such a weighing took place, as they did in Heung-Ah verification report, further detracts from the substantiality of the letter as evidence of a finding that the Dong-Ah weights were verified.

The Court holds that the letter is not substantial evidence that Commerce verified Dong-Ah's reported tube weights and that there is not substantial evidence on the record that Dong-Ah's tube weights were verified as required by 19 U.S.C. § 1677e.[27] "The failure of [defendant] to provide the court with the basis of its determination precludes the court from fulfilling its statutory obligation on review." *Industrial Fasteners Group, American Importers Ass'n v. United States*, 2 CIT

---

**26.** The Commerce verification report for Dong-Ah lists the attorney as "present at the verification." The report states that the verification took place over a five day period.

**27.** In a table of exhibits to the Dong-Ah verification report, exhibit 13 is described as:

Product liability insurance agreement. Random sample of various tube size weights taken during verification as compared to those

furnished in the response. In some sample tube weights, the tolerance is within plus or minus 10% of the weight.

Exhibit 13 contains several pages of tables with handwritten weight notations. The parties have offered no interpretation of these materials, and the Court draws no conclusion as to how they may relate to Commerce's verification.

181, 190, 525 F.Supp. 885, 893 (1981), *appeal after remand*, 3 CIT 58, 542 F.Supp. 1019 (1982), *aff'd*, 710 F.2d 1576 (Fed.Cir. 1983).

Accordingly, the action must be remanded. If Commerce investigators weighed Dong-Ah's export tubes during the on-site verification, Commerce is directed to supplement the record with a report of that verification and its findings and any redetermination of Dong-Ah's weighted-average dumping margin within thirty days from the date of this opinion. If Commerce investigators did not weigh the tubes, Commerce is directed to determine and verify the weights of Dong-Ah's export tubes and report its findings and any redetermination of Dong-Ah's weighted-average dumping margin within sixty days from the date of this opinion.

### V.  CONCLUSION

Except with respect to verification of the weights of Dong-Ah's tubes, the Court finds Commerce's determination supported by substantial evidence and otherwise in accordance with law. Plaintiffs' motion for judgment on the agency record is granted in part and denied in part, and the case is remanded for further action consistent with this opinion.

So ordered.