**ATLANTIC STEEL CO., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 83–12–01752.

United States Court of International Trade.

May 20, 1986.

Wiley & Rein (Charles Owen Verrill, Jr., Robert E. Nielsen, and Robert C. Weissler, on motion) and Fried, Frank, Harris, Shriver & Jacobson (David E. Birenbaum and Alan Kashdan, Washington, D.C., on motion), for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director (Platte B. Moring, III, Washington, D.C., on motion), for defendant.

**MEMORANDUM OPINION**

CARMAN, Judge:

Plaintiffs in this case move pursuant to Rule 56.1 for judgment upon the agency record, challenging the final determination of the United States Department of Commerce, International Trade Administration (ITA) in its antidumping investigation, *Carbon Steel Wire Rod from Trinidad and Tobago,* 48 Fed.Reg. 43,206 (Sept. 22, 1983). Defendant United States opposes plaintiffs' motion. Plaintiffs, domestic steel produc-

ers, challenge the ITA's determination as unsupported by substantial evidence and not in accordance with law because the ITA allowed adjustments to foreign market price based upon credit and warehousing costs experienced by the foreign manufacturer in its domestic market. The Court denies plaintiffs' motion for judgment on the agency record and affirms the ITA's determination.

## BACKGROUND

The ITA initiated an investigation of carbon steel wire rod from Trinidad and Tobago pursuant to a petition filed by domestic producers. The only known carbon steel wire rod producer in Trinidad and Tobago that exported to the United States during the period of investigation (April 1 to September 30, 1982) was the Iron and Steel Company of Trinidad and Tobago, Ltd. (ISCOTT). On September 16, 1983, the ITA determined that carbon steel wire rod from Trinidad and Tobago was being sold at less than fair value in the United States. 48 Fed.Reg. 43,206. In calculating dumping margins, the ITA allowed adjustments to foreign market value for differences in circumstances of sale based upon credit and warehousing costs ISCOTT claimed were greater in the home market than the United States market.

The adjustments claimed by ISCOTT arise from its practice of filling confirmed domestic orders in advance of the shipment date and storing the wire rod for those orders in its warehouse. ISCOTT prepares weekly Production Inventory Control (PIC) reports in which it identifies the wire rod in its warehouses to particular confirmed orders. The PIC report divides the warehoused wire rod into three categories: "committed," "reserved," and "available." Committed tonnage is specifically allocated to the particular customer in the PIC report; reserved tonnage is designated to particular home market customers based upon anticipated orders, but is available to fill other orders in certain situations; and available tonnage is general inventory, freely available to fill any orders.

ISCOTT held committed inventory to fill home market orders an average of approximately 9 weeks longer than it held committed inventory to fill United States orders. In calculating the home market price to obtain foreign market value, the ITA allowed adjustments for credit and warehouse costs associated with this additional standing time. Plaintiffs object that these adjustments are unsupported by substantial evidence in the record and not in accordance with law.

## DISCUSSION

The antidumping statute provides for adjustments to foreign market value when there are differences in the circumstances of sale between the foreign market and the United States market. 19 U.S.C. § 1677b(a)(4)(B)(1982). United States Department of Commerce (Commerce) regulations establish the criteria under which the ITA can adjust foreign market prices due to differences in circumstances of sale:

[R]easonable allowances will be made for bona fide differences in circumstances of the sales compared to the extent that ... the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.

19 C.F.R. § 353.15(a) (1985).

Plaintiffs claim that the ITA should not have adjusted the foreign market value for credit and warehousing costs associated with sales in ISCOTT's home market because: (1) the costs do not result in a price difference in the home market, (2) the costs are not directly related to sales, (3) the ITA's method of calculating these costs is unsupported by substantial evidence and, (4) the ITA should not have allowed the adjustments because ISCOTT's warehousing practices are "unreasonable."

(1) Plaintiffs first suggest that adjustments for the credit and warehousing costs are improper because the record contains no evidence that these added costs affected

pricing in the home market. Plaintiffs apparently read the Commerce regulation to require that a particular cost to the manufacturer results in an increased price to the home market consumer before an adjustment can be made. They rely for this interpretation on the language of the regulation allowing an adjustment so long as "the amount of any *price differential* is wholly or partly due to such circumstances." 19 C.F.R. § 353.15(a) (emphasis added). It is clear, however, from the rest of the Commerce regulation and ITA practice that the regulation imposes no such limitation.

The Commerce regulation itself provides that, in making adjustments for differences in circumstances of sale,

the Secretary will be guided primarily by the cost of such differences to the seller, but, where appropriate, he may also consider the effect of such differences upon the market value of the merchandise.

19 C.F.R. § 353.15(d). The regulation itself thus contemplates that the ITA will usually base adjustments upon the cost to the manufacturer. Moreover, the ITA has consistently applied the regulation allowing circumstances of sale adjustments based upon cost to the manufacturer as well as effect on price. *See, e.g., Television Receiving Sets, Monochrome and Color, From Japan,* 50 Fed.Reg. 24,278, 24,282 (June 10, 1985); *Carbon Steel Plate From the Republic of Korea,* 49 Fed.Reg. 26,774, 26,- 775 (June 29, 1984); *Certain Tapered Journal Roller Bearings and Parts Thereof From Italy,* 49 Fed.Reg. 2278, 2279–80 (January 19, 1984).[1]

Plaintiffs rely on this court's opinion in *Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 592 F.Supp. 1318 (1984), in which the court upheld the ITA's refusal to grant a circumstances of sale adjustment for technical services. Plaintiffs' reliance is misplaced. The *Rhone Poulenc* court refused to reverse the ITA because it agreed that the technical services were not directly related to the sales under consideration, but were general costs relating to "independent purposes such as basic research or promoting good will." 592 F.Supp. at 1335. The court based its decision on the finding that the technical services costs were not directly related to home market sales, not an inquiry into whether the claimed costs were passed on in the home market price. *See also, F.W. Myers & Co. v. United States,* 72 Cust.Ct. 219, 233, 376 F.Supp. 860, 872 (1974) ("it must be shown that each claimed expense had a reasonably direct effect upon the *sales* in the market under consideration")(emphasis added); *compare* 19 U.S.C. § 1677a(d)(1)(C)(1982) (specifically requiring a finding that taxes have been passed on in the home market price before an adjustment is allowed to United States price).

(2) Plaintiffs next argue that there is not a sufficiently direct relationship between the credit and warehousing costs and the sales under investigation because the committed wire rod is merely "general inventory." *See Steel Wire Rope From the Republic of Korea,* 48 Fed.Reg. 41,615, 41,- 617 (Sept. 16, 1983) (no adjustment allowed for costs associated with carrying general inventory). Plaintiffs suggest that the committed wire rod is general inventory because ISCOTT did not physically identify or segregate the committed tonnage of different customers. It would be burdensome and unnecessary to require ISCOTT to physically identify or segregate each cus-

---

**1.** In *Tapered Journal Roller Bearings and Parts Thereof From Italy,* 49 Fed.Reg. 2278 (1984), the ITA explicitly rejected the argument that it should not allow an adjustment for different credit costs without a showing that these costs affected price.

The fact that RIV has chosen not to increase its prices to account for the inability on the part of its customers to make payments on a timely basis does not dispose of the fact that RIV has had differing credit experiences in the two markets. To the contrary, it indicates that RIV is absorbing its costs in the American market relative to the Canadian market, an occurrence which the Act was intended to address. Since use of the cost criterion provides a means by which to redress this situation, we have used the differences in credit costs in the two markets to calculate a circumstances of sale adjustment.

*Id.* at 2280.

tomer's committed order. The ITA conducted on-site verification and concluded that the PIC report effectively identified tonnage as committed to a particular customer or available to fill new orders. It was reasonable for the ITA to find that costs associated with the wire rod identified in the PIC report as committed were directly related to the sales under investigation.

Plaintiffs also imply that, prior to actual shipment or payment, even committed tonnage must be considered general inventory. With respect to an adjustment for credit costs, plaintiffs maintain that it is "the ITA's *uniform* practice ... to deny *any* adjustment based on credit costs incurred before inventory was shipped." Plaintiffs' Brief 16. In the determinations plaintiffs cite,[2] the ITA did indeed deny adjustments for pre-shipment credit costs. The adjustments were denied, however, because the ITA found no direct relationship between the costs and the sales under investigation, not because of a policy against allowing adjustments for pre-shipment credit costs.

With respect to warehousing costs plaintiffs again rely upon the rule against allowing an adjustment unless expenses are identified with a particular sales transaction. Plaintiffs' Brief 31. Plaintiffs cite the ITA's determination in *Butadiene Acrylonitrile Rubber From Japan,* 41 Fed.Reg. 782 (Jan. 5, 1976), in which the ITA stated that adjustments for warehousing costs "could be made to the extent to which [they] are documented as being related to specific sales." *Id.* at 783. In the instant investigation, the ITA concluded that the cost to ISCOTT of warehousing committed inventory could be directly related to sales of the committed inventory. The ITA's conclusion was reasonable and is supported by substantial evidence in the record.

Nor does the Court find support in plaintiffs' argument that, because an order and commitment do not constitute a "sale" under the Uniform Commercial Code (UCC), committed tonnage should be considered general inventory and not identified with a particular sales transaction. The UCC does not control the ITA's choice of methodology in a dumping investigation. In the questionnaire used by the ITA in this and other investigations, the ITA states that sales date from the time when basic contract terms, including price, are set. *See* Record, Appendix II, p. ii of Doc. No. 18. The ITA found that a sale occurred when an order was placed, and found further that "aftersale warehousing was a condition of sale" to home market purchasers. 48 Fed.Reg. at 43,209.

The credit and warehousing adjustments allowed by the ITA relate to *post-sale* expenses. The ITA found that ISCOTT sufficiently identified committed tonnage to particular sales. Thus the time at which costs began accruing to specific sales transactions was the time of sale—when an order was placed—and not, as plaintiffs would have it, the time of shipment.

(3) The ITA allowed an adjustment for warehouse and credit costs incurred by IS-COTT from the time a home market purchaser placed an order. The ITA must therefore have assumed that finished stock sufficient to fill the order existed on the date of order. Plaintiffs contend that this assumption is not based on substantial evidence in the record and that therefore the ITA's methodology, conclusions, and ultimate determination are unsupported by substantial evidence. The Court's review of the record for substantial evidence is a limited one. So long as the record contains some evidence from which a reasonable mind could draw the conclusions the agency drew, the Court must uphold the agency. *See Carlisle Tire and Rubber Co. v. United States,* 9 CIT ——, 622 F.Supp. 1071 (1985). Confidential documents in the record show that during the period under investigation ISCOTT had sufficient avail-

**2.** Plaintiffs cite *Color Television Receivers From Korea,* 49 Fed.Reg. 7620, 7626 (March 1, 1984); *Lightweight Polyester Filament Fabrics From the Republic of Korea,* 48 Fed.Reg. 49,679, 49,683 (Oct. 27, 1983); *Certain Stainless Steel Sheet and Strip Products From France,* 48 Fed.Reg. 19,441, 19,443 (April 29, 1983), *amended,* 48 Fed.Reg. 25,244 (June 6, 1983).

able inventory to cover domestic orders as they were placed. *See* Record, Doc. Nos. 107, 127. Other confidential documents show that on the first and last days of the investigation, ISCOTT had in stock sufficient wire rod to cover outstanding orders. *See id.* Doc. No. 106. It was reasonable for the ITA to assume from this evidence that ISCOTT had inventory on hand to meet domestic orders as they were placed, and its methodology is therefore supported by substantial evidence in the record.

(4) Plaintiffs' final objection is that Commerce regulations require the ITA to allow adjustments only for costs that are reasonable. It is commercially unreasonable, plaintiffs claim, for ISCOTT to produce such large quantities of wire rod that they have enough on hand to fill orders for a period of months. The regulation provides that "reasonable allowances ... be made for bona fide differences in the circumstances of the sales compared." 19 C.F.R. § 353.15(a). The regulation requires only that the allowance be reasonable, not that the ITA make a determination as to whether the costs the foreign manufacturer incurs in different markets are reasonable.

### CONCLUSION

The ITA determined that ISCOTT incurred post-sale credit and warehousing costs in the home market and that those costs were directly related to the sales under investigation. Accordingly, the ITA allowed adjustments to the foreign market price. The Court finds that the ITA's allowance of these adjustments and its method of calculating their amount are in accordance with law and supported by substantial evidence in the record. The ITA's determination is affirmed.