**CONSUMER PRODUCTS DIVISION, SCM CORPORATION, Appellant,**

**The United States, Party-In-Interest,**

**v.**

**SILVER REED AMERICA, INC. and Silver Seiko, Ltd., Appellees.**

**Appeal No. 84–1118.**

United States Court of Appeals, Federal Circuit.

Jan. 28, 1985.

**1034**

Terence P. Stewart, Stewart & Stewart, Washington, D.C., argued for appellant. With him on the brief were Eugene L. Stewart, James R. Cannon, Jr., and Mary E. Tuck, Washington, D.C.

Ronald M. Wisla, Stewart & Stewart, Washington, D.C., was on the brief for appellant.

Edwin Silverstone, New York City, of counsel.

Robert E. Walton, New Canaan, Conn., of counsel.

Velta A. Melnbrencis, Dept. of Justice, New York City, argued for the U.S., party-in-interest. With her on the brief were Richard K. Willard, Acting Asst. Atty. Gen., and David M. Cohen, Director, Washington, D.C.

Christopher Dunn and Noel Hemmendinger, Wald, Harkrader & Ross, Washington, D.C., argued for appellees. With them on the brief was William J. Clinton, Washington, D.C.

Before RICH, DAVIS and NIES, Circuit Judges.

NIES, Circuit Judge.

This appeal arises from the February 1, 1984 decision of the U.S. Court of International Trade[1] and concerns administration of the antidumping law, 19 U.S.C. § 1673 *et seq.* Upon holding invalid a portion of the regulations implementing the statute, namely, the "ESP offset cap" contained in 19 C.F.R. § 353.15(c), the court certified

---

**1.** Reported at 581 F.Supp. 1290 (Ct.Int'l Trade 1984).

the question for immediate appeal. Our jurisdiction is found at 28 U.S.C. § 1292(d)(1). We conclude that the regulation is valid.

## I.

■ Under the antidumping provisions of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, 19 U.S.C. § 1673 *et seq.*, if foreign merchandise is sold or is likely to be sold in the United States at less than its fair value, subjecting a U.S. industry to material injury or a threat of material injury, an antidumping duty shall be imposed on such merchandise. The amount of the duty is to equal "the amount by which the foreign market value exceeds the United States price for the merchandise" (i.e., "the dumping margin"). The statute provides for several alternative bases from which to calculate the foreign market value and the U.S. price. To these base figures, certain cost adjustments are made to derive values that can reasonably be compared in order to determine whether dumping has occurred and the amount of the duty to be imposed, if any.

The present case concerns an antidumping order, published May 9, 1980,[2] against portable electric typewriters (PET's) from Japan. Silver Seiko and its U.S. subsidiary, Silver Reed America, (collectively "Silver Seiko") are subject to the order. In determining the foreign market value of Silver Seiko's goods, the price at which such goods were sold in Japan was used in accordance with 19 U.S.C. § 1677b(a)(1)(B). From this figure, Silver Seiko has been allowed to deduct all *direct* expenses of sale, e.g., expenses which vary with the quantity sold, such as commissions. The dispute concerns other deductions from that price. In particular, Silver Seiko successfully challenged a limitation which is established by regulation, 19 C.F.R. § 353.-15(c), on the amount which may be deducted from its market price in Japan for *indirect* costs of sales in Japan, e.g., overhead. Any increase in deductions from the for-

eign market value, of course, reduces the dumping margin.

The U.S. price to which the foreign market value has been compared in this case is based on the "exporter's sale price" (ESP), that is, the price at which Silver Seiko's U.S. subsidiary, Silver Reed, sells in the United States (19 U.S.C. § 1677a(c)). From ESP, pursuant to 19 U.S.C. § 1677a(e)(2), all expenses of PET sales in the U.S., both direct and indirect, have been deducted to arrive at the U.S. price used for comparison purposes. Obviously, deductions from ESP increase the dumping margin.

The regulation in issue, 19 C.F.R. § 353.-15(c), limits the amount of indirect costs which may be deducted on the foreign side of the equation to the amount deducted from the U.S. price, when such price is based on ESP. This limitation is denominated as the "ESP offset cap." The sole question presented for review is whether this cap, set by the regulation, is valid.

The regulation in question, 19 C.F.R. § 353.15, which was promulgated in 1976, provides:

§ 353.15. Differences in circumstances of sale.

(a) *In general.* In comparing the United States price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.

(b) *Examples.* Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties,

---

**2.** 45 Fed.Reg. 30618 (1980).

technical assistance, servicing, and assumption by a seller of a purchaser's advertising or other selling costs. Reasonable allowances also generally will be made for differences in commissions. Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a later sale of the merchandise by a purchaser.

(c) *Special rule.* Notwithstanding the criteria for adjustments for differences in circumstances of sale set forth in paragraphs (a) and (b) of this section, reasonable allowances for other selling expenses generally will be made in cases where a reasonable allowance is made for commissions in one of the markets under consideration and no commission is paid in the other market under consideration, the amount of such allowance being limited to the actual other selling expenses incurred in the one market, or the total amount of the commission allowed in such other market, whichever is less. *In making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses incurred in the home market up to the amount of the selling expenses incurred in the United States market.* [Emphasis added.]

(d) *Determination of allowances.* In determining the amount of the reasonable allowances for any differences in circumstances of sale, the Secretary will be guided primarily by the cost of such differences to the seller, but, where appropriate, he may also consider the effect of such differences upon the market value of the merchandise.

The last sentence of (c) above is the basis for the deduction of actual indirect selling expenses incurred in the home market (the ESP offset) and sets the limitation for deduction of such expenses (the ESP offset cap).

## II.

This case is a sequel to *Brother Industries, Ltd. v. United States,* 3 Ct.Int'l Trade 125, 540 F.Supp. 1341 (1982), *aff'd sub nom. Smith Corona Group, Consumer Products Division, SCM Corporation v. United States,* 713 F.2d 1568 (Fed. Cir.1983) *cert. denied,* —— U.S. ——, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

In the prior appeal, involving the same May 9, 1980 order, appellant SCM was the challenger rather than the defender of 19 C.F.R. § 353.15(c). SCM urged that the regulation was an invalid exercise of the Secretary of Commerce's authority in favor of foreign interests, arguing that under the statute no deduction at all was to be allowed from the foreign market price for *indirect* selling costs in the foreign market. This court, however, held that the promulgation of § 353.15(c) was a "proper and reasonable exercise of the Secretary's authority to administer the statute fairly." *Smith-Corona,* 713 F.2d at 1579.

In reaching that conclusion, the court's analysis began with the statute, 19 U.S.C. § 1677a, which provides two different bases for the comparison U.S. price, dependent upon the relationship between the exporter and importer: (1) purchase price (i.e., price paid to foreign exporter by unrelated U.S. importer) and (2) "exporter's sales price" (ESP) (i.e., price paid by U.S. customer to U.S. importer where U.S. importer is related to foreign exporter). The court interpreted the statute as requiring that adjustments due to differences in circumstances of sale bear a direct relationship to the sales under consideration[3] except when ESP is the basis for the U.S. price, in which case the statute specifies an additional deduction for all other selling expenses, that is, indirect expenses as well.

Perceiving that use of a U.S. price based on ESP, with its additional deductions,

---

**3.** Silver Seiko points out that the prior decision states that the statute *expressly* limits deductions to direct sales expenses, whereas the *express* limitation can only be found in the regulations. The government counters that the court was interpreting the statute, which admittedly does not contain the words "direct relationship" or equivalent. The result is the same, and we adopt the government's position in this opinion.

thereby skewed the calculations in favor of a higher dumping margin, the administering authority promulgated 19 C.F.R. § 353.15(c) to afford an equivalent adjustment to foreign market value. This court held that the deduction, although not specifically authorized by the statute, was valid since it was an attempt to achieve one of the goals of the statute, a *fair* comparison between foreign and domestic market prices or values.

The issue now before us is whether the regulation goes far enough. Silver Seiko argued below that "fairness" dictates that foreign indirect costs be limited only to the same *types* of costs allowed to be taken against the U.S. price, rather than to a dollar amount. The Court of International Trade agreed and held the regulation to be an "arbitrary" exercise of the discretion of the administering authority.

### III.

Silver Seiko's position is that: the ESP offset cap prevents proper adjustment for "differences in circumstances of sale" as required by 19 U.S.C. § 1677b(a)(4)(B); frustrates the fundamental goal of the antidumping law by preventing a fair comparison of prices in the U.S. and Japanese markets; and lacks any rational basis since it represents an arbitrary restriction adopted solely as an administrative compromise.

SCM and the Government counter that: 19 U.S.C. § 1677b(a)(4)(B) has long been interpreted as limited to directly related selling expenses, which accords with Congressional intent, and thus, no deduction for *indirect* expenses is required by that section; the deduction allowed under the ESP offset cap corrects the amount of the distortion of the dumping margin caused by the additional statutory deduction against ESP and, thus, is not an arbitrary limitation; and, finally, the ESP offset cap facilitates administration.

The Court of International Trade concluded that the cap was invalid because it did not "comport with the underlying statutory objective of an efficient and fair com-

parison of prices in two markets." We do not see that the court based its decision on a requirement mandated by 19 U.S.C. § 1677b(a)(4)(B), which had been urged by Silver Seiko. Rather, the court relied on its perception of what was required simply to make the comparison fair.

### IV.

The basis for Silver Seiko's argument that the statute *requires* deduction of all expenses of sale (direct and indirect) is the language of 19 U.S.C. § 1677b(a)(4)(B):

(4) Other adjustments.—In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any differences between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—

(A) the fact that the wholesale quantities, in which such or similar merchandise is sold or, in the absence of sales, offered for sale, for exportation to, or in the principal markets of, the United States, as appropriate, in the ordinary course of trade, are less or are greater than the wholesale quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale, in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold for home consumption, then for exportation to countries other than the United States);

(B) *other differences in circumstances of sales*;

\*    \*    \*    \*    \*    \*

*then due allowance shall be made therefor.* [Emphasis added.]

Silver Seiko argues that the only restriction contemplated by (B) above is proof of the difference, not whether the difference relates to direct or indirect costs.

Appellants, on the other hand, point out that from 1960 to 1976 the implementing

regulations permitted deductions only for those expenses which had a "direct relationship" to the sales under consideration. In 1960, the regulations were changed as a consequence of the unsatisfactory administrative experience in attempting to enforce the statute. Foreign producers had claimed indirect expense deductions under the rubric of "differences in circumstances of sale" to the point where price disparity routinely disappeared.

As observed by then Deputy Assistant Secretary of the Treasury, J.P. Hendrick:

> In connection with selling expenses they [the foreign producers] were claiming deductions for salesmen's salaries, for rent of office space the salesmen occupied or for depreciation on buildings or portions of buildings devoted to their use, and for any other portions of their general expenses—salaries, maintenance, overhead, and so forth—which could be considered part of the sales, as distinguished from the production effort. The resultant home market price calculations were claimed by them to be reduced to a point where initial apparent disparities again and again would, if the claims were allowed, completely disappear. Given sufficient imagination, lawyers and accountants can produce surprising results!

> \*   \*   \*   \*   \*   \*

> It was these considerations which gave rise to the revisions in the regulations under the Antidumping Act published on July 5, 1960.

Hendrick, *The United States Antidumping Act*, 58 Am.J. of Int'l L. 914, 922–23 (1964).

The only statement by Congress brought to our attention concerning the restriction of 19 U.S.C. § 1677b(a)(4)(B) to directly related selling expenses is the following:

> Regulations will establish groups of adjustments based on types of adjustments currently recognized, that is, differences in circumstances of sale (e.g., credit terms, warranties, differences in the level of trade, and assumption by a seller of a purchaser's advertising or selling costs

and commissions), quantities sold, and differences in the merchandise compared.

> Such adjustments to the price of similar merchandise sold in the exporter's home market or third country markets are appropriate in determining FMV. However, if adjustments are improperly made, the result may be an unjustifiable reduction in or elimination of the dumping margin. Therefore, *the Committee intends that adjustments should be permitted if they are reasonably identifiable, quantifiable, and directly related to the sales under consideration* and if there is clear and reasonable evidence of their existence and amount. [Emphasis added.]

H.R. Report No. 96–317, 96th Cong., 1st Sess. 77 (1979).

The above quotation indicates to us not merely legislative acquiescence, but affirmative approval of what was, even in 1979, a longstanding practice of limiting deductions for differences in circumstances of sale to direct expenses, i.e., expenses of the type identified above. According to the Government, and acknowledged by appellees, the only exception to the practice had been when ESP was used as the U.S. price, in which case indirect expenses were allowed to be deducted from the U.S. price and from foreign market price as well, to the extent of the U.S. indirect expenses. These adjustments were first a matter of practice, then set forth in regulations in 1976, and finally in 1979 codified into the statute in part and continued in the regulations.

In view of these considerations, we conclude that the Secretary is not required by 19 U.S.C. § 1677b(a)(4)(B) to make an adjustment for indirect selling expenses. Rather, as concluded in *Smith-Corona*, the basis for the deduction of any such expenses in calculating foreign market value is simply to counterbalance the unfairness resulting from adjustments to ESP which are now required specifically by 19 U.S.C. § 1677a(e).

The issue before us comes down then to a question of whether the regulation estab-

lishing the ESP offset cap is a reasonable exercise of the Secretary's discretion.

As this court recently stated in *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir.1984):

> When the issue is the validity of a regulation issued under a statute an agency is charged with administering, it is well established that the agency's construction of the statute is entitled to great weight. *Zenith Radio Corp. v. United States*, 437 U.S. 443 [98 S.Ct. 2441, 57 L.Ed.2d 337] (1978); *Udall v. Tallman*, 380 U.S. 1 [85 S.Ct. 792, 13 L.Ed.2d 616] (1964); *Selman v. United States*, 498 F.2d 1354, 1356 [204 Ct.Cl. 675] (1974). Similarly, agency regulations are to be sustained unless unreasonable and plainly inconsistent with the statute, and are to be held valid unless weighty reasons require otherwise.... [Citations omitted.]

In determining whether a regulation is reasonable, we must give considerable deference to the expertise of the agency, i.e., the "masters of the subject." *National Muffler Dealers Association v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979).

With respect to the "master" of antidumping law, i.e., now the Secretary of Commerce, this court stated in *Smith-Corona*, 713 F.2d at 1571:

> The Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, establishes an intricate framework for the imposition of antidumping duties in appropriate circumstances. The number of factors involved, complicated by the difficulty in quantification of these factors and the foreign policy repercussions of a dumping determination, makes the enforcement of the antidumping law a difficult and supremely delicate endeavor. The Secretary of Commerce ... has been entrusted with responsibility for implementing the antidumping law. The secretary has broad discretion in executing the law.

Further, it is a cardinal principle that the Secretary's interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable. *See, e.g., Fulman v. United States*, 434 U.S. 528, 534–36, 98 S.Ct. 841, 845–46, 55 L.Ed.2d 1 (1978) (regulation which had a "reasonable basis" in the statutory history upheld, even though taxpayer's challenge had "logical force"). *See also United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967) ("[I]f found to 'implement the Congressional mandate in some reasonable manner,' [regulation] must be upheld.").

Silver Seiko finds support for its position that the cap is unfair in the following statements of this court in the *Smith-Corona* opinion:

> One of the goals of the statute is to guarantee that the administering authority makes the fair value comparison on a fair basis—comparing apples with apples. The offset appears to generate two fair value comparisons, apples with apples (purchase price) and oranges with oranges (exporter's sales price). The difference between United States price generated from purchase price and from exporter's sales price was created by the statute. Were it not for the exporter's sales price offset, comparisons based on purchase price would be fair, yet comparisons based on exporter's sales price would be skewed in favor of a higher dumping margin. We do not believe that the statute requires the Secretary to compare both apples and oranges with only apples. Rather, it expressly requires a fair comparison. The offset is an attempt to achieve such a comparison.

The proper adjustment under the above rationale, per Silver Seiko, is to allow deduction of all indirect selling costs in Japan from the foreign market value, just as all indirect selling costs are deducted from the U.S. price (when based on ESP). Only then, according to the argument, will oranges be compared with oranges; only then will the law operate against unfair competition as intended, rather than create an unfair trade barrier.

SCM and the Government also find support for their contrary position in *Smith-Corona*. Repeatedly, the decision emphasizes the broad discretion granted to the Secretary in administering the antidumping law. Here, the Secretary perceived an unfairness in the literal application of the statute and undertook to remedy the situation. The Secretary also perceived that the unfairness was corrected by the ESP offset and offset cap provisions of 19 C.F.R. § 353.15(c).

 We find no arbitrariness in limiting the adjustment for indirect selling expenses allowed against the Japanese market price to the amount of such expenses in the United States. The decision to do no more than nullify the amount by which the price comparison would have been skewed in favor of a higher dumping margin is not irrational. Indeed, any greater allowance could distort the computations in favor of foreign manufacturers.

Further, the cap does aid in efficient administration and assists the agency in meeting the exigencies of time and staff limitations. As stated in the legislative history of the Trade Agreements Act of 1979:

> A major objective of this revision of the ... law is to reduce the length of an investigation. Long investigations serve no purpose. They delay relief for domestic industries. They prolong the period of uncertainty, inherent during an investigation, making business decisions by importers difficult if not impossible.

S.Rep. 249, 96th Cong., 1st Sess. 49 (1979), U.S.Code Cong. & Admin.News 1979, 381, 435. The ESP offset cap undoubtedly furthers this valid goal. In accordance with the ESP offset cap, Commerce need only be convinced that *valid* expenses meet or exceed the level of the cap. In a very practical sense, the extent of scrutiny is reduced. The result is a more efficient and expedited administrative process.

Under the limited standard of judicial review applicable to this case, the regulation must be upheld since it is not in conflict with the statute and, further, is supported on a rational basis.

### Conclusion

Our review of the overall statutory purpose of 19 U.S.C. § 1673 *et seq.* convinces us that the promulgation of the ESP offset cap in 19 C.F.R. § 353.15(c) is a fair and reasonable exercise of administrative authority. Accordingly, we *reverse* the ruling of the U.S. Court of International Trade on the certified question presented and *remand* for further proceedings consistent herewith.

REVERSED AND REMANDED.