**BRITISH STEEL CORPORATION,**
**et al., Plaintiffs,**

**v.**

**UNITED STATES, et al., Defendants,**

**Allegheny Ludlum Steel Corporation, et al., Defendants-Intervenors.**

**No. 83–7–01032.**

United States Court of
International Trade.

March 31, 1986.

Steptoe & Johnson (Richard O. Cunningham, Charlene Barshefsky, William L. Martin, II and Neil R. Ellis, Washington, D.C., of counsel), for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, and Sheila N. Ziff, Washington, D.C., Esq., for defendants.

Collier, Shannon, Rill & Scott (David A. Hartquist and Paul C. Rosenthal, Washington, D.C., of counsel), for defendants-intervenors.

NEWMAN, Senior Judge:

### Introduction

The central issue presented, having significant international trade implications for foreign governments that make "equity infusions" in state-owned enterprises in poor financial health, is: Under what circumstances are such companies "uncreditworthy" thereby making the government's investments commercially unreasonable and hence countervailable subsidies under 19 U.S.C. § 1677(5)(B)(i). On this vital aspect of the case, the present opinion is a sequel to the court's previous decision, *British Steel Corporation v. United States*, 9 CIT ——, 605 F.Supp. 286 (1985), remanding the action to the United States Department of Commerce, International Trade Administration (ITA) for further proceedings, discussed below. Of transcendent importance in this case are the methodologies used by ITA on remand in valuing the alleged subsidies.

This court's decision of March 8, 1985 sustained ITA's final affirmative countervailing duty determination regarding stainless steel plate from the United Kingdom, 48 Fed.Reg. 19048, April 27, 1983 (Final), finding that the British government's equity investments in British Steel Corporation (BSC) from fiscal year (FY) 1978/79 to FY 1981/82 constituted countervailable subsidies within the meaning of 19 U.S.C. § 1671. However, pursuant to the Government's request (and over plaintiff's opposition), this action was remanded to ITA for: (1) redetermination of whether the equity infusions during FY 1977/78 [1] constituted countervailable subsidies; (2) supplementation of the administrative record with all information obtained and/or utilized by ITA in making its determination relative to

---

1. BSC's FY ends on March 31st. Thus, FY 1977/78 encompasses the period April 1, 1977 through March 31, 1978.

the creditworthiness of BSC in FY 1977/78; (3) revaluation and recalculation of the subsidies affected by ITA's new methodologies described in the "Subsidies Appendix" to the Final Affirmative Countervailing Duty Determinations and Countervailing Duty Order in *Cold-Rolled Carbon Steel Flat-Rolled Products from Argentina,* 49 Fed. Reg. 18006, 18016 (April 26, 1984) (Final).

On September 9, 1985 ITA transmitted to this court its Results of Remand Proceedings ("Remand Results"), in which ITA determined: (1) equity infusions by the British government in FY 1977/78 were made "on terms inconsistent with commercial considerations" within the meaning of 19 U.S.C. § 1677(5)(B)(i), and consequently, constituted countervailable subsidies; and (2) the benefits from the equity infusions during FYs 1977/78 to 1981/82 should, irrespective of the actual use of the funds, be amortized over a fifteen year period, representing the average useful life of renewable physical assets in the domestic steel industry.[2]

Oral argument was heard pursuant to plaintiff motion on March 11, 1986; at the conclusion, the court reserved decision.

Presently before the court is plaintiffs' motion under Rule 56.1 for judgment on the agency record in connection with the foregoing Remand Results. Seeking reversal and further remand, plaintiffs contend that the following aspects of ITA's Remand Results are unsupported by substantial evidence and otherwise not in accordance with law: (1) ITA's finding that the British government's equity infusions in BSC during FY 1977/78 were inconsistent with commercial considerations; (2) ITA's fifteen-year allocation period for amortizing the benefits associated with subsidy funds used for certain purposes other than acquisition of long-lived assets; and (3) ITA's methodology for calculating the benefits associated with the British government's loan forgiveness to BSC.

Defendants and intervenors have responded seeking affirmance of the Remand Results.

*The Commercial Reasonableness of the British Government's Equity Infusions in BSC in FY 1977/78*

Initially, the court addresses ITA's reevaluation of the commercial reasonableness of the British government's equity infusions in BSC in FY 1977/78.

Section 771(5) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(5), embraces any subsidy "bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise" including: "[t]he provision of capital, loans or loan guarantees *on terms inconsistent with commercial considerations*" (emphasis added). In 605 F.Supp. 286, this court construed the "commercial considerations" test concluding that an investment is consistent with commercial considerations if a reasonable investor could expect a reasonable rate of return on his investment within a reasonable period of time. 605 F.Supp. 286, 293. In its earlier decision, this court reviewed the financial history of BSC and found that for FYs 1978/79 through 1981/82, "given BSC's deteriorating financial condition and precarious situation, no private sector investor expecting a reasonable return on his investment within a reasonable time would have given any consideration whatever to investing in BSC during the period of its restructuring." *Id.* at 293. On remand, ITA applied the same "reasonable investor" criterion in determining whether the British government's equity infusions in FY 1977/78—the year at issue in the present review—were "inconsistent with commercial considerations" within the meaning of the statute.

In reevaluating the commercial reasonableness of the equity infusions by the British government during FY 1977/78, ITA reviewed BSC's financial history, commencing with its establishment in 1967. The review covered such fundamental indicia of financial condition as net income of BSC, net income before interest and taxes, cash flow from operations, coverage of in-

---

**2.** The Remand Results have not been published    in the Federal Register.

terest expenses, return on equity, return on sales and current assets and liabilities.

ITA also considered such additional pertinent factors as the substantial cost of forming BSC, leading to unfavorable financial results for the first few years of the company's existence; the enormous social costs borne by BSC because of the British government's policy decisions, such as keeping high-cost plants open to preserve jobs; BSC's massive losses; the extremely bleak prospects of the company expressed by its own chairman in BSC's 1976–77 annual report; and the dismal outlook for the world steel market in general.

Based on its analysis of the foregoing factors, ITA reached the following conclusion:

> After considering the results for fiscal years 1975–76 and 1976–77 and the outlook for the world steel market in general, a reasonable investor in 1977 would not have considered British Steel with its large losses, poor return on equity, and other signs of structural problems, to be a reasonable commercial investment.

Record on remand, document 1 at 7.

The court finds substantial evidence in the record of the bleak financial condition of BSC in FY 1977/78 and the precariousness of any expectation of future profitability. If ITA's application of the statutory expression "commercial considerations" is reasonable and not in conflict with the expressed intent of Congress, such interpretation is entitled to the traditional deference courts pay to agency interpretation. *Board of Governors, FRS v. Dimension Financial Corp.*, — U.S. —, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986); *United States v. Riverside Bayview Homes*, — U.S. —, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chemical Manufacturers Assn. v. Natural Resources Defense Council, Inc.*, 470 U.S. —, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2881–83, 81 L.Ed.2d 694 (1984) and *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d

337 (1978). *See also American Lamb Company v. United States*, 4 CAFC —, 785 F.2d 994 (1986); *Smith Corona Group, Consumer Products Division, SCM Corp. v. United States*, 713 F.2d 1568, 1571 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); and *Consumer Products Division, SCM Corp. v. Silver Reed America*, 753 F.2d 1033, 1039 (Fed.Cir.1985). Furthermore, it is a cardinal principle that "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding". *Chevron, U.S.A., Inc.*, 104 S.Ct. at 2782 n. 11. *See also Chemical Manufacturers Association*, 105 S.Ct. at 1108; and *Consumer Products Division*, 753 F.2d at 1039.

Plaintiffs argue that ITA's "reasonable investor" test is irrelevant to the commercial reasonableness of the British government's equity infusions and contrary to law. According to plaintiffs, the British government, unlike an outside investor, could not simply abandon BSC and incur no further losses if it decided to close the firm, and therefore the steps the British government took as the sole investor in the corporation were reasonably taken to minimize its prospective losses. In short, plaintiffs contend that the overall operating results and financial ratios of a loss-incurring company are irrelevant to the issue of whether the British government's equity infusions were inconsistent with commercial considerations within the purview of the statute.

The nub of the dispute between the parties concerns the interpretation of the term "commercial considerations"—specifically, whether the statutory indicium of a subsidy prescribed by section 1677(5)(B)(i) permits ITA to assess the British government's equity infusions in BSC in FY 1977/78 from the standpoint of the reasonable outside investor, as claimed by defendants and intervenor. In essence, ITA considered whether a reasonable investor seek-

ing to make a sound investment would have invested in BSC during the period in question given BSC's history, financial status and the outlook for the steel industry in general at that point in time. As stated by ITA (record on remand, document 1 at 23–24):

When determining whether an equity investment is consistent with commercial considerations, the Department first looks for the value of the stock as determined by the market place. To the extent that a government procures stock at a market price, there is no subsidy. If a government pays a premium price for the shares, its investment is inconsistent with commercial considerations. When a firm's shares are not traded publicly, there is no market-determined price. Therefore, the Department must rely on information available to it that would be available to an investor at the time of the investment as a means of determining the commercial reasonableness of investments in the company.

Such an investor will study the company's financial statements to assess the company's current health and past performance. To get an idea of what events and decisions underlie these financial results, as well as to understand management's views of the company's goals and future prospects, an investor will also examine carefully the other information contained in the company's annual reports. Then, to evaluate the company's prospects in a wider context, an investor will consider any available independent studies and forecasts of the industry in general.

In connection with the instant litigation, BSC commissioned an economic analysis by Dr. Joseph W. McAnneny of Economists, Incorporated (record on remand, document 7 (non-confidential version)).[3] Predicated on his analysis, Dr. McAnneny submitted the following arguments concerning ITA's methodology:

First, based on application of ITA's reasonable investor test to six integrated U.S. steel producers with unfavorable operating results in 1981–84, McAnneny would expect to find that none of these companies were able to attract capital. Yet, during the period 1981–84, all the producers raised debt and equity capital in significant amounts.

Second, ITA has created a *per se* rule—that continued investment in a failing company for any reason is inconsistent with commercial considerations—which rule conflicts with observed market behavior where frequently corporations reorganize around their profitable assets, rather than terminate all productive facilities.

Finally, ITA's reasonable investor test focuses primarily on recent and current financial performance to the exclusion of other relevant data, and neglects to consider possible remedies that a firm might take to reposition itself in a market or reduce operating costs and restore profitability.

In view of the foregoing shortcomings of ITA's test, as perceived by McAnneny, he proposes an alternative standard for determining whether investment in a loss-incurring corporation is inconsistent with commercial considerations. Specifically, McAnneny proposes application of two tests:

(1) The corporation should continue to operate (and the investor should continue to cover operating losses) for facilities where revenues exceed the variable costs of production and make some contribution to coverage of fixed expenses. Predicated on this test, plaintiffs maintain that the term "commercial considerations" permits ITA to assess the commercial reasonableness of equity infusions from the standpoint of the interest of the British government and BSC's management in minimizing its losses. Plaintiffs also posit that U.S. investors and lenders "customarily" inject funds in failing companies to minimize their losses, irrespective of any expectation of future profits.

---

**3.** J. McAnneny, Calculation of Subsidies Under the Countervailing Duty Law: An Economic Analysis (July 8, 1985).

(2) The investor should undertake all new investment schemes (or fund to completion existing investment schemes) where the discounted cash flows from the investment exceed the cost of the investment (*viz.*, the net present value or "NPV" of specific projects or ventures are greater than zero).

Based on the application of the foregoing tests, McAnneny argues that investments by the British government in FY 1977/78 in BSC were consistent with "commercial considerations".

*Capital-Raising Experiences of Six U.S. Steel Companies*

■ As underpinning for their argument that BSC was creditworthy in FY 1977/78, plaintiffs heavily rely upon McAnneny's study of the capital-raising experiences of the six largest integrated U.S. steel companies during the three year period 1982–84. In his study, McAnneny found that the three-year operating results of the six companies were as poor as or worse than those of BSC in the two years prior to FY 1977/78. Despite their unfavorable operating results, McAnneny found that each of the U.S. companies attracted significant amounts of debt and equity capital. Plaintiffs contend that under ITA's test, none of these companies should have been able to attract debt or equity capital, and consequently ITA erroneously determined that for FY 1977/78 investment in BSC was not commercially reasonable.

Defendants challenge the validity of McAnneny's conclusions on the grounds that: 1) he used a different time period, 1982–84, for his comparison of the returns on equity of the United States steel producers with those of BSC in FY 1977/78, thus failing to consider the different economic climate, different market and different investor expectations in the two time periods; 2) market and investor expectations would depend, in part, on the financial history of the domestic companies, as well as the prevailing economic conditions, which were not considered by McAnneny; and 3) McAnneny erroneously assumed that ITA looked only at BSC's performance for the two preceding FYs, 1975/76 and 1976/77, when in fact, ITA considered BSC's financial history for FYs 1973/74 to 1977/78. In short, defendants insist that the fact the U.S. companies raised debt capital in 1982–84 is irrelevant to the question of BSC's ability to obtain private investment in the different market prevailing in 1977–78; and that it is "sheer speculation to assert that, under ITA's test, the domestic companies would not have been considered commercially reasonable investments" (defendant's memorandum at 24).

The court agrees with defendants' position. The capital-raising ability of the United States firms having different financial histories and future prospects than BSC during the economic climate of 1982–84 does not refute ITA's finding that equity infusions by the British government in BSC in FY 1977/78 were inconsistent with commercial considerations.

*"Variable Costs" Test*

■ Plaintiffs further proffer McAnneny's "variable costs" test, *viz.*, that although a firm may show an overall loss, it should continue to operate so long as it can earn at least enough to cover its variable costs. The theory is that having covered variable costs, additional revenue can defray some of the fixed costs (costs that continue to exist even if production ceases, like rent). If a firm whose revenues did exceed its variable costs were to cease production, it would be foregoing revenue that could have helped to defray fixed costs. Accordingly, even though a firm may not be earning enough to cover its total costs (fixed plus variable), it would be economically rational to continue operations so that the overall loss would be minimized by the additional revenues. McAnneny maintains that equity funds used to help cover BSC's operating losses are not subsidies if BSC was covering its variable costs at the time.

As aptly pointed out by defendants, the variable cost test may be a useful analytical tool for the owner-manager as a means of deciding whether (and for how

long) to continue operating a loss-incurring company, but the test is inapposite to investment decisions by private investors. Simply put, it would be unrealistic to expect a private sector investor to supply operating funds to a loss-incurring firm merely to permit the firm to continue operations to minimize its losses. Thus, while it may be perfectly rational for an owner to sustain loss-minimizing operations, it would not be commercially reasonable for an investor to provide funds for that purpose without adequate assurance of the future profitability of the enterprise and a return on his investment within a reasonable time. The record supports no such assurances for BSC in FY 1977/78. Under these circumstances, ITA properly rejected application of the variable costs test.

■ The court stresses here that equity infusions in loss-incurring companies do not *per se* confer a subsidy, and defendants have not so argued in this case. Defendants agree with plaintiffs that the sole fact a company has been incurring losses is not dispositive of whether investments are consistent with commercial considerations. On that score, defendants point out ITA found that equity investments in BSC in years prior to FY 1977/78 were consistent with commercial considerations despite the fact that the company was sustaining substantial losses.

Although not germane to the variable costs analysis, it should also be mentioned that McAnneny attempts to justify the British government's equity infusions in BSC on the theory that it is likely that "opportunity costs" in some form would have been incurred by BSC (*i.e.*, BSC's income would have fallen) had the British government failed to make its equity infusions in FY 1977/78. Again, such rationale may be applicable to the British government and BSC, who concededly had no option but to continue operation of BSC. Nonetheless, avoidance of such opportunity costs by equity infusions are irrelevant to a reasonable investor analysis.

## Net Present Value Test

■ Dr. McAnneny also urges that the Net Present Value (NPV) test be utilized in determining the commercial reasonableness of the British government's investments in BSC. Hence, McAnneny observes that under standard principles of economic analysis, the commercial reasonableness of capital expenditures by BSC on new projects must properly be judged against an evaluation of the NPV of each project. Thus, projects whose discounted cash flows show a positive NPV are commercially justified; projects whose cash flow show a negative NPV are not. According to plaintiffs, NPV analysis focuses upon whether investment in a new project is commercially worthwhile (positive), and it is irrelevant whether a capital project (or some combination of projects) returns the corporation to overall profitability. In support of NPV analysis, plaintiffs make reference to "concrete market examples" of private companies that had suffered heavy losses in successive years and nevertheless continued to make new capital investments.

Defendants, however, correctly observe that NPV analysis is largely predicated upon long-term earnings and interest-rate assumptions, which at best would be tenuous; and that BSC furnished analyses only of individual projects without any evaluation of those projects in terms of their effect upon BSC's overall operations and income-producing prospects.

While unquestionably NVP analyses were of importance to BSC's management, they were relevant to an outside investor only to the extent that the analyses showed how the investments in the individual projects would affect the overall operations and future profitability of BSC. Stated differently, from the investor's point of view, an investment would not be commercially reasonable if *overall* the company may still constantly lose money and never provide a reasonable return no matter how justifiable a company's decision respecting individual projects analyzed on the basis of NPV.

As stated by ITA in its remand results (record on remand, document 1 at 24–26):

> The plaintiff suggests that a better way of measuring the commercial reasonableness of investment in a company is to examine the company's decisions on specific levels of production, capital expansion, and closing of plants. The Department agrees that a profit-maximizing company should use the types of analyses suggested by the plaintiff when making its managerial decisions on these issues, i.e., managers will attempt to set production at a level where marginal revenue equals marginal cost and will select among capital projects by comparing the net present values of alternative projects. However, while the Department does not take issue with the plaintiff on the economic validity of such tests, the Department believes tests of individual project decisions present too limited an appraisal of a company's overall condition to be the bases of the Department's methodology for evaluating purchases of equity. Such purchases relate to a company's operations as a whole, not just individual activities. Analyses of individual investment (disinvestment) projects, while laudable, are often meaningless in the context of a debate over the wisdom of equity purchases in a corporation. An individual project may be expected to be highly profitable, and indeed prove to be highly profitable once completed, yet the overall losses of the rest of the corporate investments may more than offset the new source of profitability. To the extent the Department should examine individual project appraisals, it should only do so if the respondent offering the appraisal also supplies contemporary analyses of the relevance of the project to the overall health of the corporation. For example, if a company is losing a billion dollars annually on all its investments and a new project provides a positive net return of $200 million, the company overall would still be losing $800 million annually and

is, therefore, probably a bad equity investment.

Continuing, ITA commented (*Id.* at 26): British Steel, in the several project analyses submitted in response to the draft results of the remand, has not provided any information as to the effect of these projects on the corporation's overall prospects for profitability. The Department's broader approach, which does not limit itself to an analysis of individual management decision but instead looks at the overall performance of the company in the context both of the company's views of its prospects and independent industry forecasts, gives a better picture of the overall condition of a company and the reasonableness of investment in it.

Another serious problem stressed in the Remand Results is that ITA

> might legitimately find a company that loses money year after year, and yet that same company can show it has never started a project without a thorough analysis that indicates the project will be profitable. An examination of the parts does not necessarily reflect the reality of the whole. [*Id.* at 27.]

The court holds that ITA properly declined to judge the commercial reasonableness of investment in BSC in FY 1977/78 on the basis of an economic analysis focused simply on the NPV of individual projects.

In sum, the court finds ITA's determination that the British government's investments in BSC in FY 1977/78 were inconsistent with commercial considerations, predicated upon its reasonable investor test, is supported by substantial evidence and otherwise in accordance with law.

### ITA's Methodology for Valuing the Benefits from Equity Infusions

We now turn to the difficult issues concerning ITA's revised methodologies for valuing the benefits of the British government's equity infusions.

In its final determination in 1983, ITA calculated the value of the alleged subsidy

benefits to BSC in accordance with the principles announced in *Certain Steel Products from Belgium,* 47 Fed.Reg. 39304, 39316 (1982) (Final) (Appendix 2). However, in its Remand Results, ITA followed the revised methodology announced in the 1984 proceedings involving steel imports from Mexico and Argentina ("revised methodology"). *Certain Carbon Steel Products from Mexico,* 49 Fed.Reg. 5142, 5148 (1984) (Preliminary); *Cold-Rolled Carbon Steel Flat-Rolled Products from Argentina,* 49 Fed.Reg. 18006, 18016 (1984) (Final). Under the revised methodology, ITA allocated the subsidies arising from the British government's equity infusions over 15 years, irrespective of the use to which the funds were put. Such allocation period subsumed a stream of benefits lasting the average useful life of integrated steel-producing assets, as determined by the United States Internal Revenue Service.

ITA's allocation method is explained (record on remand, document 2 at 40):

> To allocate these benefits over time, the Department has considered various allocation periods including a variety of fixed time periods and the average life of long-term debt for a company or country, but has concluded that there are no economic or financial rules that dictate the choice of any one particular allocation period. Therefore, the Department has chosen a standard period—the average useful life of a company's renewable physical assets as determined by the U.S. Internal Revenue Service. The Department has openly stated that its choice is arbitrary in the sense that there are several viable options from which it could choose. However, within the context of the countervailing duty law, which dictates a period reflecting the commercial and competitive benefit of the subsidy, the Department believes its choice is reasonable. In addition to reasonableness, this standard offers predictability in the outcome of Department proceedings and, more importantly, eliminates inconsistent results between companies and countries.

Plaintiffs vigorously object to the use of the 15-year amortization period respecting subsidy funds that were not used to acquire long-lived assets,[4] but rather were used for other purposes. Specifically, plaintiffs argue that based on generally accepted accounting principles (GAAP):

1) The benefit of funds used to purchase assets prematurely retired must be expensed in the year of retirement.

2) The benefit of funds used to cover operating losses must be expensed in the year of receipt.

3) The benefit of funds used to cover redundancy and closure costs must be fully recognized in the year the decision is made to close the facility.

It is plaintiffs' position that ITA's across-the-board application of a 15-year amortization period for valuation of these "non-capital" subsidies is arbitrary, unsupported by substantial evidence of record, contravenes GAAP, and fails to reflect the commercial and competitive benefit of the equity infusions.[5]

■ Preliminary to discussion of the merits of the parties' contentions, it must be recognized that judicial deference should be accorded agency construction of a statute that it is charged with enforcing, particularly with respect to the broad discretion of the agency to apply reasonable methodologies in implementing the law. *American Lamb Co., supra; Consumer Products Division, SCM Corp.,* 753 F.2d at 1039; *Melamine Chemicals, Inc. v. United States,* 732 F.2d 924, 928 (Fed.Cir.1984); *Smith-Corona Group, Consumer Products Division, SCM Corp.,* 713 F.2d at 1571; *Carlisle Tire & Rubber Co., Division of Carlisle Corp. v. United States,* 10 CIT ——, 622 F.Supp. 1071 (1985); and

---

**4.** There is no dispute that only a portion of the subsidy funds provided by the British government during FYs 1977/78 through 1981/82 were used for the acquisition of capital assets.

**5.** Plaintiffs do not challenge the 15-year allocation period as applied to subsidy funds used to acquire long-lived assets.

*Bingham & Taylor, Division, Virginia Industries, Inc., et al. v. United States,* 11 CIT —, 627 F.Supp. 793 (1986) (judicial deference inapplicable where agency interpretation is contrary to statute and Congressional intent). Further, it should be stressed that ITA's methodology need not be the most reasonable in order to be upheld by this court, nor need it be the methodology that this Court would have selected had it been the decision maker. *Asahi Chemical Industry Co. v. United States,* 4 CIT 120, 123, 548 F.Supp. 1261, 1264 (1982).

In a recent decision, *Alhambra Foundry v. United States,* 10 CIT —, 626 F.Supp. 402 (1985), the court, while recognizing that ITA in its discretion may choose one methodology or another in calculating the benefits of bounties or grants, pointed up that "any methodology employed must reasonably accurately reflect factual information in the administrative record" (At 408). Moreover, the Federal Circuit recently cautioned that the administering authority's discretion is not "unbounded". *Freeport Minerals Company v. United States,* 776 F.2d 1029 (1985) (citing *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 166–68, 83 S.Ct. 239, 244–46, 9 L.Ed.2d 207 (1962). And of course, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress". *Board of Governors,* 106 S.Ct. at 686.

██ Challenged here is ITA's methodology of allocating the benefits of the British government's equity infusions over 15 years, across the board irrespective of the use of the funds, representing the average useful life of capital assets in the integrated steel mills in the United States.

The legislative history of the Trade Agreements Act of 1979 shows that Congress recognized the concept of allocating the benefits of subsidies over a number of years, in conformity with the commercial and competitive benefit of the subsidy to the recipient:

There is a special problem in determining the gross subsidy with respect to a product in the case of nonrecurring subsidy grants or loans, such as those which aid an enterprise in acquiring capital equipment or a plant. Reasonable methods of allocating the value of such subsidies over the production or exportation of the products benefiting from the subsidy must be used. *In particular, a reasonable period based on the commercial and competitive benefit to the recipient as a result of the subsidy must be used.* For example, allocating a subsidy in equal increments over the anticipated 20-year useful life of capital equipment purchased with the aid of the subsidy would not be reasonable if the capital equipment gave the recipient of the subsidy an immediate significant competitive benefit compared to what would be the situation without the capital equipment and compared to the competitive benefit the equipment would likely provide in the later stages of its useful life.

S.Rep. No. 249, 96th Cong., 1st Sess., at 85–86, 1979 U.S.Code & Ad.News at 381, 472–473 (emphasis added).

Significantly, the Senate's report states that in allocating the benefit of the subsidy "a reasonable period based on the commercial and competitive benefit to the recipient as a result of the subsidy must be used". In the present case, ITA failed to adequately explain why a 15-year allocation period is reasonable based on the commercial and competitive benefit of the subsidies in question to BSC.

After careful review of ITA's methodology for allocating the benefits of the equity infusions, the court is constrained to conclude that linking the commercial and competitive benefit of the subsidies at issue to the 15-year average useful life of capital assets in the U.S. steel industry, while administratively convenient, is unreasonable and not in accord with Congressional intent that the benefits be allocated over a period of time reflecting *the commercial and competitive benefit of the subsidy to the recipient.*

The court recognizes that each of the valuation methodologies ITA considered has certain financial and economic "pit-

falls" and an inherent element of arbitrariness. But the court fails to perceive any basis whatever in the legislative history of the Trade Agreements Act of 1979, logic or the facts of record for allocating the commercial and competitive benefit of the subsidies at issue over a period linked to the average useful life of capital assets in the integrated U.S. steel mills.

ITA itself has conceded that the life of capital assets does not necessarily relate to the economic benefits of subsidy funds:

> [W]e recognize first that physical assets are often a *fairly small part of the cost of doing business*, and second that even in highly capital intensive industries the benefit of funds received ... *has no particular relationship to the life of the machinery.*

Subsidies Appendix to *Cold-Rolled Carbon Steel Flat-Rolled Products from Argentina,* 49 Fed.Reg. 18006, 18018 (April 26, 1984) (Final) (emphasis added).

In the foregoing decision, ITA further candidly explained:

> We originally chose the average useful life of the assets because we believed the benefits of a grant somehow had a life approximating the life of the assets ... *We now consider this belief wrong; the life of the benefits is not observable.*

*Id.* at 18021 (emphasis added).

Again, in *Certain Carbon Steel Products from Mexico,* 49 Fed.Reg. 5142, 5150 (Feb. 10, 1984) (Preliminary) ITA frankly stated:

> The "life" of the countervailable benefit is indefinitely diffused around the time that the cash benefit arises. Therefore, *the average life of equipment is arguably no more accurate a measure than simply choosing a number.* [Emphasis added.]

Fundamentally, "an arbitrary allocation of [the] benefit" cannot be sustained. *Michelin Tire Corp. v. United States,* 6 CIT ——, Slip Op. 83–136 (December 22,

1983), *vacated,* Slip Op. 85–11 (January 28, 1985).

As previously noted, plaintiffs maintain that the subsidies in dispute must be allocated in accordance with GAAP. Interestingly, a portion of the legislative history of the 1979 Act cited by plaintiffs indicates that Congress intended "relating the value of a subsidy *for acquiring assets* to their anticipated useful life, based on generally accepted accounting principles". H.R.Rep. No. 317, 96th Cong., 1st Sess. 75 (1979) (emphasis added). Hence, it is clear that Congress intended that GAAP should be used where the funds provide an enterprise with capital equipment or a plant. But, there is nothing in the legislative history of the 1979 Act suggesting that Congress expected that the value of a subsidy *not* used for acquiring assets be related to either the useful life of capital assets or to GAAP. Rather, in H.R.Rep. No. 317, *supra,* at 75, Congress stated that "[valuation] methods should include relating the benefit of the commercial advantage *to the recipient*" (emphasis added). The subsidies at issue here—funds used by BSC to cover its operating costs (or defray operating losses), redundancy and closure funds and funds used to purchase assets prematurely taken out of use in the course of restructuring— obviously aid in keeping the recipient firm in business and making it more efficient and competitive. Undoubtedly, therefore, the commercial and competitive benefit of these subsidies continue beyond the year of receipt and into subsequent accounting periods. *See* Slip Op. 85–26 at 22–23.[6] While plaintiffs are correct in asserting that *Michelin Tire Corp. v. United States,* 4 CIT 252 (1982), *vacated,* 9 CIT ——, Slip Op. 85–11 (January 28, 1985), suggested reliance on GAAP under certain circumstances, the *Michelin* court subsequently, upon further consideration of the matter, admonished against the use of valuation techniques that do not provide "a basic

---

**6.** In its prior decision, Slip Op. 85–26, at p. 23, this court expressly rejected plaintiffs' contention that capital assets confer no further benefit after they are prematurely retired, and that con-

sequently ITA must recognize in full (expense) the undepreciated cost of the asset in the year that it is taken out of use in conformance with GAAP.

correspondence of the subsidy to the benefit". *Michelin Tire Corp., supra,* Slip Op. 83–136 at 3. "Expensing" the "non-capital" subsidies at issue in accordance with GAAP would not provide a correspondence of the subsidies to their benefit, and consequently GAAP should not be applied under the circumstances of this case.

Although previously rejected by ITA, with some justification,[7] intervenors nonetheless suggest that the benefit of the subsidies in question should be allocated on the basis that they relieve BSC of the necessity for issuing long term debt on a commercial basis. Intervenors' hypothesis is that the commercial and competitive benefit of the subsidies is not the specific uses to which the funds were put, "but rather in being able to avoid the alternative commercial cost of obtaining the funds. BSC thus gains a commercial and competitive advantage over nonsubsidied firms who must pay a commercial financing cost to get funds to carry out exactly the same purposes" (memorandum at 21).

Intervenors' proposal—for allocation of the subsidies in question on the hypothesis that long-term debt financing by BSC was the most likely commercial alternative to the government's equity infusions—comports with the following observations in *Michelin Tire Corp., supra,* Slip Op. 83–136, regarding the benefits of a subsidy:

The benefits which must be withdrawn by payment of duty in the case of a subsidy are the benefits which result as a direct consequence of the subsidy. For a business, the direct consequences of receiving a gift of money normally are the elimination of the necessity of looking elsewhere for those funds and paying the price required by the alternative source of funds. The normal alternative sources of funding for business enterprises are two—the sale of shares in the business, carrying with it the obligation to share the profits, or the incurring of debt, carrying with it the obligation to repay the creditor with interest.

*See also:* Paul W. Jameson, *The Administration Of The U.S. Countervailing Duty Laws With Regard To Domestic Subsidies: Where It's Been, Where It Is, Where It May Go,* 12 Syracuse Journal of International Law and Commerce, 59, 110 (1985), in which the author observes:

Despite possible objections that a company may raise money through equity issues or long-term loans, it is usually preferable to allocate the value of a grant over the life of long-term debt rather than allocate the grant over the average lifetime of assets. One cardinal principle of the countervailing duty law is that the subsidy is the money received, rather than whatever is purchased with that money. When coupled with the principle that the value of the subsidy is its value to the recipient, it is apparent that it is more consistent to view a grant as a substitute for a long-term loan rather than something somehow tied to a company's assets. If one were to compare the grant to a long-term loan that a company would have to raise as an alternative (even to use a hypothetical long-term loan for a company that has none), and state that the amount of the subsidy is the difference between what the recipient of the grant must pay on the grant (nothing) and what the recipient would have been required to pay on a loan (principal plus interest), the result would be a subsidy that could very well be larger than the amount of the grant but would not violate GATT.

In summary, while the court need not at this juncture pass upon the merits of intervenor's suggested allocation technique, based upon long-term debt financing, the court ineludably concludes that ITA's 15-year allocation methodology, which links the commercial and competitive benefit of the equity infusions to the average useful life of capital assets in integrated U.S. steel mills, is neither supported by the record nor Congressional intent. Accordingly, the court finds that ITA's methodology is unreasonable and therefore not in accordance

7. *See* 49 Fed.Reg. at 18018.

with law. Consequently, this action must be remanded to ITA for further consideration of other "viable options" that may more reasonably reflect the benefit of the subsidies in question.

### British Government's Forgiveness of Indebtedness

■ In 1981, the British government forgave £509 million in long-term indebtedness owed by BSC to the National Loans Fund. In its Remand Results, ITA treated the loan forgiveness as an additional equity investment amortizable over 15 years.[8] For purposes of such amortization, ITA utilized an interest rate of 17.11 percent, representing the 1981 United Kingdom domestic corporate bond rate plus a risk premium. The weighted average interest rate on BSC's existing loans in 1981 was 11.57 percent.[9]

Plaintiffs contend that ITA's methodology for calculating the benefit of the loan forgiveness, predicated upon 1981 interest rates and a 15-year amortization period, is arbitrary and fails to reflect the commercial and competitive benefit to BSC of the interest and principal payments forgiven. On that score, plaintiffs urge that inasmuch as the interest rates on the existing loans were fixed, absent the British government's forgiveness BSC would have *continued* to pay 11.57 percent—not a rate based on what new capital would have cost BSC in 1981, *viz.*, 17.11 percent. Plaintiffs also challenge ITA's 15-year allocation period as arbitrary since the remaining life of the loans in question was substantially shorter than 15 years and ITA inexplicably

refused to use the repayment schedules associated with the forgiven loans.

The court fails to perceive any reasonable basis for ITA's action in valuing the benefit of the loan forgiveness on the basis of what it would have cost BSC to obtain new financing in 1981. BSC was incurring an average fixed interest rate of only 11.57 percent on the forgiven loans, and BSC would have been required to continue paying only that rate if the loans had not been forgiven. In evaluating the subsidy arising from the loan forgiveness, the commercial and competitive benefit to BSC is the actual financial burden that was removed by the loan forgiveness. Absent the loan forgiveness, BSC undoubtedly would have continued to pay 11.57 percent interest on its existing loans, and most assuredly BSC would not have refinanced its debt at a cost of 17.11 percent, which refinancing is implicit in ITA's methodology.

ITA's apparent predicate that but for the loan forgiveness by the British government, BSC would have relieved itself of its existing loans by new borrowing at the then current rate of 17.11 percent is, in the words of the United States Supreme Court, "economically senseless".[10] *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As previously emphasized, the commercial and competitive benefit of the subsidy to the recipient is the measure of the value of the subsidy. In the case of debt forgiveness, the commercial and competitive benefit to the recipient firm is debt extinguishment. Thus, it is logical that such subsidy should be measured by the actual interest and principal

---

8. As disclosed in BSC's annual report, the £509 million in loans forgiven in 1981 represents funds received by the corporation from 1967 through 1978. A similar loan forgiveness in 1971–72 occurred during the period in which ITA considered the British government's equity infusions to be consistent with commercial considerations and thus not to confer a countervailable benefit.

9. The interest rate on BSC's loans ranged from 6.75 percent to 16.75 percent, with a weighted average rate for all of the loans of 11.57 percent.

10. The obvious unreasonableness of ITA's loan forgiveness methodology may be illustrated by the following hypothetical case: In 1965 a British company borrows money from the government at an interest rate of 9 percent, to be repaid in 1982. In 1980 the government forgives the loan. The prevailing interest rate for corporate bonds in Great Britain in 1980 is 15 percent. Following the methodology applied to BSC in the present case, ITA would amortize the unpaid principal of the loan forgiven at 15 percent (plus a risk premium) over a period of 15 years.

repayment obligations over the remaining life of the existing loans, rather than in accordance with hypothetical refinancing at a higher rate of interest than the firm is paying on its existing loans for an arbitrary period of years.[11]

The short of the matter is ITA's methodology for valuing the benefits associated with the British government's 1981 loan forgiveness is contrary to law and unsupported by substantial evidence. Therefore, this action is remanded to ITA for revaluation of the benefits of the 1981 debt forgiveness consistent with the foregoing opinion.

### Conclusion

The Remand Results are affirmed insofar as ITA determined that the equity infusions by the British government in FY 1977/78 were made "on terms inconsistent with commercial considerations" within the meaning of 19 U.S.C. § 1677(5)(B)(i), and therefore constitute countervailable subsidies.

ITA's valuation methodology in this case is unsupported by substantial evidence and otherwise is not in accordance with law because it fails to reflect the commercial and competitive benefit of the subsidies in question to the recipient.

It is, therefore, ORDERED:

1) The Remand Results are affirmed insofar as ITA determined that the equity infusions by the British government in FY 1977/78 were made "on terms inconsistent with commercial considerations" within the meaning of 19 U.S.C. § 1677(5)(B)(i), and therefore constitute countervailable subsidies.

2) This action is remanded to ITA for reconsideration of its revised valuation methodologies and recalculation of the ben-

efits of the British government's equity infusions consistent with this opinion; and

3) ITA shall report the results of its recalculations and redeterminations to this court within 60 days after the date of entry of this order.

---

**11.** As pointed up by plaintiffs, ITA offered no explanation in the Remand Results for its refusal to calculate the benefits associated with the 1981 debt forgiveness based on the actual interest rate BSC was incurring, nor for its use of a 1981 interest rate for loans to BSC during the period 1967–77, nor of its choice of a 15-year amortization period. Plaintiffs have advised the court that the interest differential between 17.11 percent and 11.57 percent based on a 1981 balance of £509 million results in an overvaluation of the loan forgiveness benefit of nearly £29 million.