RSI (INDIA) PVT., LTD., et al., Plaintiffs,

v.

UNITED STATES, Defendant,

and

Pinkerton Foundry, Inc., et al., Defendant–Intervenors.

Court No. 87–01–00086.

United States Court of International Trade.

April 27, 1988.

Brownstein, Zeidman & Schomer, Irwin P. Altschuler, Denise T. DePersio, David R. Amerine, and Ronald M. Wisla, and Kaplan, Russin & Vecchi, Dennis James, Jr. and Kathleen Patterson, Washington, D.C., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, U.S. Dept. of Justice, Elizabeth C. Seastrum, U.S. Dept. of Commerce, Washington, D.C., Mark J. Sadoff, for defendant.

Collier, Shannon, Rill & Scott, Paul C. Rosenthal, Carol A. Mitchell and Robin H. Beeckman, Washington, D.C., for defendant-intervenors.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Judge:

Indian exporters and United States importers of iron-metal construction castings from India (plaintiffs) move under Rule 56.1 of the Rules of this Court for judgment upon the record that the International Trade Administration of the United States Department of Commerce (Commerce) compiled in a countervailing duty administrative review. This Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) (Supp. IV 1986) and 28 U.S.C. § 1581(c) (1982). The Court holds that Commerce's determination to countervail the entire benefit conferred by pig iron payments is supported by substantial evidence and is according to law, but that Commerce's calculation of the net benefit received by RSI (India) Pvt., Ltd. is not supported by substantial evidence on the record. The Court

also holds that Commerce's methodology in constructing an interest rate benchmark for packing credit loans is reasonable and is according to law.

## BACKGROUND

Commerce determined in 1980 that the government of India was providing subsidies to Indian producers of iron-metal castings for export to the United States. *Countervailing Duties—Certain Iron-Metal Castings From India; Final Countervailing Duty Determination,* 45 Fed. Reg. 55,502 (Aug. 20, 1980). After the United States International Trade Commission determined that a United States industry was materially injured by reason of the subsidized imports, *Certain Iron-Metal Castings From India,* 45 Fed.Reg. 66,915 (Oct. 8, 1980), Commerce imposed countervailing duties on the imported products, which included manhole covers and frames, clean-out covers and frames, and catch basin grates and frames. *Certain Iron-Metal Castings From India; Countervailing Duty Order,* 45 Fed.Reg. 68,650 (Oct. 16, 1980).

At the request of the domestic producers of iron construction castings, Commerce initiated a countervailing duty administrative review of merchandise imported during 1984. R. 11–12; *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 50 Fed.Reg. 46,689 (Nov. 12, 1985). After verifying questionnaire responses, holding a public hearing, and receiving comments from interested parties, Commerce determined the net subsidy from all the programs reviewed to be 8.08% ad valorem. *Certain Iron–Metal Construction Castings From India; Final Results of Countervailing Duty Administrative Review,* 51 Fed. 45,788 (Dec. 22, 1986).

Plaintiffs filed an action in this Court to challenge Commerce's final results in its administrative review as being unsupported by substantial evidence on the agency record or otherwise not in accordance with law. One plaintiff was dismissed from the action because it was found not to be an interested party. *RSI (India) Pvt.,* *Ltd. v. United States,* 12 CIT ——, 678 F.Supp. 304 (1988).

## SCOPE OF REVIEW

■ The Court will sustain Commerce's determinations in a review conducted pursuant to section 751 of the Tariff Act of 1930, as added by section 101 of the Trade Agreements Act of 1979, as amended, 19 U.S.C. § 1675 (1982 & Supp. IV 1986), if the findings are supported by substantial evidence on the record and are not contrary to law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Under the substantial evidence standard for review of agency determinations, the Court will affirm the agency's findings if they are supported in the record by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986); *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 136, 744 F.2d 1556, 1562 (1984). Substantial evidence is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from being supported by substantial evidence. *ICC Indus. v. United States,* 812 F.2d 694, 699 (Fed.Cir.1987); *Matsushita Elec. Indus. v. United States,* 3 Fed.Cir. (T) 44, 51, 750 F.2d 927, 933 (1984).

## DISCUSSION

Plaintiffs' challenges frame three questions for the Court:

1. Did Commerce act reasonably and in accordance with law in countervailing pig iron payments made under a formula which grossly overstated actual consumption of pig iron?

2. Does the record contain substantial evidence to support Commerce's calculations of the net benefit of payments to RSI (India) Pvt., Ltd.?

3. Did Commerce use a reasonable methodology in constructing an interest rate benchmark for pre-shipment export loans?

I. *International Price Reimbursement Scheme*

IPRS is a program which the government of India originally established for exporters of products with steel inputs. R. 382–83. *See Sawhill Tubular Div. Cyclops Corp. v. United States*, 11 CIT —, 666 F.Supp. 1550, 1551 (1987). When domestic pig iron prices increased substantially during 1983, the Indian government extended IPRS to include products manufactured with pig iron. R. 383; 51 Fed.Reg. at 35,677. By rebating to castings exporters the difference between the higher domestic and the government-determined lower "world price" of pig iron, a professed purpose of the program is to encourage Indian manufacturers to use Indian pig iron in producing castings. Conf.R. 111; 51 Fed.Reg. at 35,677.

IPRS is administered by the Joint Plant Committee, a body composed of India's main pig iron and steel producers and chaired by an Indian government official. R. 382–83; 51 Fed.Reg. at 45,789. The Joint Plant Committee regulates the price of Indian pig iron and determines the amount of the IPRS payments. 51 Fed. Reg. at 45,789. Payments are made from the Engineering Goods Export Assistance Fund, which is financed by a levy included in domestic pig iron prices. R. 382. The Joint Plant Committee calculates the amount of IPRS payments based upon the differential between domestic and "world" pig iron prices, multiplied by the amount of castings exported and a standard factor ostensibly representing the amount of pig iron consumed. R. 383–87; Fed.Reg. at 45,789. When Commerce verified the IPRS program, however, it found significant discrepancies between theory and practice.

First, Commerce found that the standard factor for pig iron consumption in the formula used to calculate IPRS payments grossly overstated the actual amounts of pig iron consumed in producing castings. Between January 1 and August 22, 1984, the standard factor for pig iron allocation was equal to 70% by weight of the iron content of exported castings, meaning that the rebate was calculated as if pig iron

constituted 70% of the total volume of pig iron and scrap consumed in the manufacture of castings. R. 386–87; 51 Fed.Reg. at 45,789. During the latter part of 1984, the standard factor for pig iron allocation was raised to 110%. R. 386; Conf.R. 162; 51 Fed.Reg. at 45,789. An extra ten percent is used as a constant to represent the percentage of melting loss of pig iron in producing castings. R. 386. Commerce verified, however, that the Indian manufacturers' actual consumption rates were [at confidential amounts], significantly lower than either the 70% or 110% standard factors. Conf.R. 162, 175–76; 51 Fed.Reg. at 45,789.

Second, Commerce found there was no true "world price" or "international price" for pig iron, as there is for steel quoted on the Japan and London Metals exchanges. R. 385. Commerce found instead that the "world price" used to calculate IPRS payments is actually the last contract purchase by the Steel Authority of India (SAIL), an Indian government agency which purchases large quantities of pig iron to cover differences between supply and demand for domestic pig iron. R. 384–85; 51 Fed.Reg. at 45,789. SAIL floats global tenders, receives quotations from Brazil, Japan, and Pakistan, and contracts with the lowest bidder. R. 385. During 1984, the "world price" of pig iron was based SAIL's August, 1983 contract for pig iron from India's neighbor, Pakistan. R. 385.

Based upon the absence of a genuine relationship between IPRS payments and actual consumption of pig iron, and with no reliable world price for pig iron, Commerce stated that it could not determine whether the IPRS was not distorting market forces, functioned as a duty drawback scheme, or was consistent with item (d) of the Illustrative List of Export Subsidies annexed to the GATT Subsidies Code. Commerce thus found the IPRS payments to be a direct export subsidy and countervailable in full. 51 Fed.Reg. at 45,789.

1

The Indian exporters assert that to the extent that IPRS payments rebate only the difference between the price of pig iron as

it is available in India and the price commercially available on world markets, the payments do not constitute an export subsidy and should not be countervailed as a matter of law under paragraph (d) of the Illustrative List of Export Subsidies, annexed to the Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade, Apr. 12, 1979, 31 U.S.T. 513, 546, T.I.A.S. 9619, 55 U.N.T.S. 194 (the GATT Subsidies Code), which characterizes as a subsidy:

> The delivery by governments or their agencies of imported or domestic products or services for use in the production of exported goods, on terms or conditions more favourable than for delivery of like or directly competitive products or services for use in the production of goods for domestic consumption, if (in the case of products) such terms or conditions are more favourable than those commercially available on world markets to their exporters.

The Illustrative List of Subsidies has been adopted by Congress, 19 U.S.C. §§ 1677(5)(A), 2502(1), and 2503(c)(5) (1982), but it is not exhaustive. S.Rep. No. 249, 96th Cong., 1st Sess. 84–85, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 470–71; H.R.Doc. No. 153, 96th Cong., 1st Sess. pt. II, at 432, *reprinted in* 1979 U.S. Code Cong. & Admin.News 665, 698.

According to the Indian exporters, the GATT Subsidies Code establishes as a matter of law that where an exporter can either import raw materials at world market prices or spend more to purchase raw materials domestically, no subsidy is conferred when a government enables that exporter to purchase domestically produced raw materials at world market prices because there is no condition that is more favorable than one commercially available on world markets.

In its review results, Commerce stated that because there was no true world market price for pig iron, and because there was no apparent relationship existing between the amount of the IPRS payments and the actual consumption of pig iron,

Commerce could not determine whether the operation of the IPRS program was consistent with item (d) of the Illustrative List of the GATT Subsidies Code. 51 Fed.Reg. at 45,789. In other determinations, Commerce has been able to rely upon paragraph (d) of the Illustrative List of Export Subsidies. In *Final Negative Countervailing Duty Determination; Certain Steel Wire Nails from the Republic of Korea,* 47 Fed.Reg. 39,549, 39,551 (Sept. 8, 1982), Commerce stated that under paragraph (d) "price preferences for inputs to be used in the production of export goods constitute a subsidy only if the preference lowers the price of that input below that which the input purchaser would pay on world markets." In *Final Negative Countervailing Duty Determination; Oil Country Tubular Goods from Taiwan,* 51 Fed.Reg. 19,583, 19,585 (May 30, 1986), Commerce stated that "a price preference for inputs used in the production of export goods constitutes a subsidy [under paragraph (d) ] only if the preference lowers the price below world-market levels."

■ Because Commerce verified that there was no relationship between actual consumption of pig iron and the amount of IPRS payments for using pig iron, the Court finds that the Government of India did provide goods on terms more favorable than those commercially available on world markets. The Indian exporters' argument that the IPRS payments fall within an exception to paragraph (d) of the Illustrative List of Export Subsidies is without merit.

The Indian exporters argue that by countervailing the IPRS payments in their entirety, rather than only the amount by which the payments excessively refunded to the manufacturers the costs of using domestic pig iron in the exported castings, Commerce overstated the countervailable benefit in contravention of the countervailing duty laws. The Indian exporters also assert that Commerce was provided with and verified sufficient information to enable it to precisely calculate the excessive portion of the IPRS payments. Although the standard consumption factors in the IPRS payment formula were significantly

higher than the actual consumption of pig iron, the Indian exporters urge that Commerce could have determined the amounts of pig iron incorporated into the exported castings, and could have imposed countervailing duties only to the extent that the standard rates were higher than actual consumption.

■ Under the countervailing duty laws, a subsidy has the same meaning as the term "bounty or grant" and is defined to include a government's provision of goods at preferential rates and a government's assumption of any costs or expenses of manufacture or production. 19 U.S.C. § 1677(5)(B)(ii) and (iv) (1982). The countervailing duty law requires that the amount of any countervailing duty imposed on foreign merchandise be "equal to the net amount of such bounty or grant, however the same be paid or bestowed." 19 U.S.C. § 1303(a) (1982). Although the phrase "net amount" is undefined, see S.Rep. No. 249, 1st Sess. 85, reprinted in 1979 U.S.Code Cong. & Admin.News 471, the countervailing duty law also requires the amount of a duty imposed to be "equal to the amount of the net subsidy." 19 U.S.C. § 1671(a) (Supp. IV 1986). To determine the "net subsidy," Congress has directed Commerce to subtract from the gross subsidy the amount of

(A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the subsidy,

(B) any loss in the value of the subsidy resulting from its deferred receipt, if the referral is mandated by Government order, and

(C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the subsidy received. 19 U.S.C. § 1677(6) (1982). These three items do not expressly include the non-excessive portion of rebates as an adjustment to the amounts of a gross subsidy, and the legislative history of this provision shows that Congress intended this list to be narrowly drawn and all inclusive. S.Rep. No. 249, 96th Cong., 1st Sess. 86, reprinted in 1979 U.S.Code Cong. & Admin.News 472.

■ This Court must accord substantial weight to an agency's interpretation of statutes it administers. American Lamb Co. v. United States, 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986). An agency's interpretation of a statute need not be the only reasonable interpretation or the one which the court views as the most reasonable. ICC Indus., 812 F.2d at 699; Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc., 3 Fed.Cir. (T) 83, 90, 753 F.2d 1033, 1039 (1985). However, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986). The Court's role when that intent is not contravened is to determine whether the agency's interpretation is "sufficiently reasonable." American Lamb, 4 Fed.Cir. (T) at 54, 785 F.2d at 1001. This Court has also held that while Commerce may choose a methodology in its discretion to calculate the net benefits of bounties or grants, any methodology employed must reasonably and accurately reflect factual information contained in the administrative record as a whole. See Ceramica Regiomontana, S.A. v. United States, 10 CIT ——, 636 F.Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed.Cir.1987); British Steel Corp. v. United States, 10 CIT ——, 632 F.Supp. 59, 68 (1986); Alhambra Foundry v. United States, 9 CIT 632, 636, 626 F.Supp. 402, 408 (1985).

The Indian exporters correctly note that each of the Indian manufacturers provided Commerce with information on their sales and their actual pig iron and scrap usage rates. See R. 52–53, Conf.R. 8–9, 32–39. Through an on-site verification at two of the companies, Commerce verified the actual scrap and pig iron ratios for these two companies and confirmed the accuracy of their reported rates. Conf.R. 176 (RSI), 192 (Serampore).

■ Although Commerce could calculate the actual amounts of pig iron consumption for the IPRS formula from the verified figures for RSI and Serampore and from

the non-verified figures for the other exporters, the payments made bore absolutely no relationship to actual consumption of pig iron. It is not the responsibility of Commerce to tinker with a program of the Indian government to make it non-countervailable. The Court upholds Commerce's construction of the statute and the methodology employed. The Court finds that Commerce's determination is supported by substantial evidence on the record and is according to law.

### 2

The Indian exporters also contend that the IPRS program functions in a fashion similar to two prior determinations where Commerce found that two-tier pricing structures resulting from duty drawback schemes did not confer a bounty or grant. *Certain Steel Wire Nails from the Republic of Korea,* 47 Fed.Reg. at 39,549, and *Oil Country Tubular Goods from Taiwan,* 51 Fed.Reg. at 19,585.

Korea's duty drawback system created a two-tier pricing system in *Steel Wire Nails,* where a largely-government owned steel producer charged lower prices for rod used to fabricate export products and higher prices for rod used to fabricate products sold domestically. The price of steel imported for the domestic market was higher because it carried customs duties, while the price of imported steel for export products was lower because it did not carry duties that would be refunded. Commerce thus found the two-tier pricing structure to be a commercial response to segmented markets rather than a countervailable scheme to subsidize exports. 47 Fed.Reg. at 39,551.

In the determination concerning *Oil Country Tubular Goods from Taiwan,* the petitioners alleged a State-owned corporation provided raw materials at preferential prices. Commerce determined that a higher, first-tier price was based upon the "duty-paid" price of imported hot-rolled coil, while a lower, second-tier price was offered to manufacturers of goods for export at the "duty-free" price of hot-rolled coil. Upon examining the second-tier prices, Commerce found the duty free prices to be at world-market levels and determined that the two-tier pricing policy conferred no countervailable benefit. 51 Fed.Reg. at 19,585.

According to the Indian exporters, the IPRS creates a two-tier pricing structure similar to those investigated in the Republic of Korea and the Republic of China:

> One tier consists of higher priced pig iron for domestic consumption, supported by high import duties. The second tier provides lower priced pig iron (approximating world prices) for use in export production. This pricing structure provides protection to the domestic pig iron industry, but enables the export industries that use pig iron ... to remain internationally competitive.

> The IPRS program is thus similar in operation to the familiar customs duty drawback system.... Non-excessive rebates paid to offset the price differential between imported raw material prices and world market raw material prices caused by a protective tariff are not countervailable. [Citations omitted]. Similarly, a program promoting the use of domestic raw materials rather than imported raw materials, and providing a rebate equal to the price differential between the world price and the domestic price of raw materials consumed in the manufacture [of] a finished product, should not be considered countervailable.

Brief in Support of Plaintiffs' Motion for Judgment on the Agency Record, at 18–19.

█ It is agreed that the drawback, rebate, or remission of Customs duties not in excess of the actual duties due or paid on imported items physically incorporated in the final product is not regarded as a countervailable subsidy, 19 C.F.R. § 355, Annex 1, ¶ 3 (1987), nor is a non-excessive remission of indirect taxes. *Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *Industrial Fasteners Group v. United States,* 1 Fed.Cir. (T) 81, 84, 710 F.2d 1576, 1579 (1983).

Commerce argues that the IPRS bears no resemblance to the duty drawback programs in the Republic of Korea or the

Republic of China which the Indian exporters hold out as support. Each of those determinations related two-tier pricing structures to the refund or remission of actual duties. Commerce also maintains that IPRS operates without the type of administrative controls normally associated with a drawback of duties paid on imported merchandise physically incorporated in the exported products. In its review results, Commerce stated that because there was no apparent relationship between the amount of the IPRS payments and actual consumption of pig iron, and because there was no true world price for pig iron, Commerce could not determine whether IPRS payments functioned as a duty drawback scheme. 51 Fed.Reg. at 45,789.

■ The record does not contain sufficient evidence to support the Indian exporters' claim that IPRS payments function as a duty drawback scheme. The Court finds that in the absence of any relationship between pig iron payments and consumption, and in the absence of any controls normally associated with a duty drawback program, Commerce acted reasonably in determining that it could not determine whether IPRS payments functioned as a duty drawback program.

3

The Indian exporters also assert that Commerce's determination to countervail the IPRS program in its entirety is arbitrary and capricious and constitutes an abuse of administrative discretion. Upon review of the administrative record, and upon review of the arguments already discussed, the Court finds these assertions to be without merit. This part of the action is affirmed.

II. *Calculation of the Net Benefit of IPRS Payments*

RSI (India) Pvt., Ltd. argues that Commerce overstated the net benefit of RSI's IPRS payments, claiming that Commerce should have allocated RSI's reported IPRS payments over exports of all castings rather than exports of only those castings under investigation.

In response to Commerce's questionnaire request for the amount of IPRS payments for the exported castings under investigation (i.e., heavy castings), RSI reported its total IPRS payments for all the castings it exported, including castings not under investigation (i.e., light castings). Conf.R. 10–11, 43–44, 169, 278–80. RSI also reported the total value of exports of the subject (heavy) castings to all countries and to the United States. R. 392; Conf.R. 9. Commerce verified RSI's questionnaire responses concerning castings exports and IPRS payments. R. 392–95.

Commerce calculated the net countervailable benefit bestowed by the IPRS program by totalling all IPRS payments each Indian exporter reported for 1984 and dividing these payments by each company's total exports of subject castings. R. 455; Conf.R. 211. Commerce derived an ad valorem benefit then weighted by each company's share of exports to the United States of the castings under investigation. R. 455; Conf.R. 211.

Following publication of the preliminary determination, *Certain Iron–Metal Construction Castings From India; Preliminary Results of Countervailing Duty Administrative Review,* 51 Fed.Reg. 35,676 (Oct. 7, 1986), the Indian exporters notified Commerce that the calculation for RSI was incorrect because the IPRS payments for all casting products exported (both lightweight castings not under investigation and heavy castings that were under investigation) was divided by the export value of only those castings under investigation. Conf.R. 278–80. Because the numerator in this equation included IPRS payments RSI received for all castings exports, the Indian exporters asked Commerce to amend the denominator to reflect the value of all castings exports. It is Commerce's failure to make this correction in the final determination that the Indian exporters challenge.

■ As stated earlier, Commerce may choose a methodology in its discretion to calculate the net benefit of a subsidy, but any methodology employed must reasonably and accurately reflect factual informa-

tion contained in the administrative record as a whole. *Ceramica Regiomontana,* 10 CIT at —, 636 F.Supp. at 966; *British Steel Corp.,* 10 CIT at —, 632 F.Supp. at 68; *Alhambra Foundry,* 9 CIT at 636, 626 F.Supp. at 408. Furthermore, the countervailing duty law requires the amount of any countervailing duty imposed on foreign merchandise to be "equal to the net amount of such bounty or grant, however the same be paid or bestowed," 19 U.S.C. § 1303(a) (1982), and "equal to the amount of the net subsidy." 19 U.S.C. § 1671(a) (Supp. IV 1986).

■ The Court finds that Commerce's methodology does not reasonably and accurately reflect factual information contained in the administrative record. The information relied upon was verified, and Commerce made the same requested correction for another Indian exporter, Serampore Industries Pvt., Ltd. This part of the action is reversed and remanded to Commerce to recalculate the net ad valorem benefit for RSI, and to recalculate the weighted average country wide rate using the corrected RSI ad valorem rate.

### III. *Packing Credit Loans*

Commerce determined that through commercial banks, the Reserve Bank of India provided short-term, packing credit loans to exporters at preferential rates of interest. *See* 51 Fed.Reg. at 45,790. Commerce found that during 1984, the Reserve Bank of India provided loans to exporters at the rate of 12% interest per anum for 90 day loans, 14.5% for 135 day loans, and 16.5% for 180 days. R. 388, 418, 456.

Commerce verified that there is no national average short-term commercial rate in India, but that actual non-preferential interest rates on short-term commercial loans varied between 16.5% and 18.5% in 1984, depending on the level of borrowing. R. 388–89; 51 Fed.Reg. at 45,790. For loans of 2 rupees (Rs.) to Rs. 25 lakhs (one lakh equals 100,000 rupees, and is written in India as 1,00,000), the average interest rate was 16.5%. R. 389. For loans over Rs. 25 lakhs, the average interest rate was 18%. *Id.*

In calculating the amount of the countervailable subsidy, Commerce used a benchmark of 18% to measure the benefit conferred by the loans, because Commerce "could not know what the rate would be to the exporters." 51 Fed.Reg. at 45,790. The 18% rate represents the average interest rate for loans over Rs. 25 lakhs. The Indian exporters assert that the benchmark of 18% is too high.

Commerce has stated that an appropriate national average benchmark for short term loans "should reflect the predominant alternative sources of short term financing available to an average firm." *Oil Country Tubular Goods From Argentina; Final Results of Countervailing Duty Administrative Review,* 52 Fed.Reg. 846, 848 (Jan. 9, 1987). This statement is based on Commerce's established policy that Commerce will not look to company-specific experience in calculating a benchmark for short-term interest rates. Subsidies Appendix, *Cold–Rolled Carbon Steel Flat–Rolled Products From Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 49 Fed.Reg. 18,006, 18,020 (Apr. 26, 1984).

■ The Indian exporters argue that Commerce verified that the exporters subject to review secured commercial loans at less than 18%. RSI received a 16.5% short-term loan from the Bank of Maharashtra, and Serampore Industries received a cash credit loan at 17.5%. R. 403, 418. Commerce also examined newspaper advertisements for open market interest rates of 14% and 15% under fixed deposit schemes. R. 403. However, nothing in the record suggests that RSI's or Serampore's loans, or loans connected to fixed deposit schemes, reflect a predominant alternative source of short term financing available to an average firm in India. Commerce's decision not to include the company-specific experiences is consistent with its established policy for short-term loans.

The Indian exporters also suggest a benchmark of 17.25% as a compromise between 16.5% and 18% interest rates. Com-

**614**

merce rejected this approach in its final administrative review, and used the average interest rate for loans over Rs. 25 lakhs. 51 Fed.Reg. at 45,790. The Court finds that while the Indian exporters suggest an equitable resolution, there is no legal support for adopting its solomonic solution.

■ The record confirms that there is no national average which Commerce could employ as a benchmark. *See Alhambra Foundry v. United States*, 9 CIT 632, 635, 626 F.Supp. 402, 407 (1985), and Commerce determined that it could not know what actual rates exporters would receive. "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT —, 636 F.Supp. 961, 967 (1986), *aff'd*, 810 F.2d 1137 (Fed.Cir.1987). The Court holds that Commerce's decision to use an 18% commercial interest rate benchmark for short term loans is supported by substantial evidence on the administrative record and is according to law.

### CONCLUSION

Commerce's determination to countervail the IPRS payments in full is supported by substantial evidence on the record and is according to law, but the action is remanded to Commerce to recalculate the net ad valorem benefit for RSI and to recalculate the weighted average country wide rate using RSI's new ad valorem rate. Commerce's use of an 18% interest rate benchmark is affirmed.